FILED
CLERK

10/19/2016 4:36 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MARK HOROWITZ and MONTAUK U.S.A., LLC,

                               Plaintiffs,

                -against-

148 SOUTH EMERSON ASSOCIATES, LLC,

                            Defendant.
------------------------------------------------------------------X

<u>ORDER</u>
16-CV-2741(SJF)(AKT)

FEUERSTEIN, District Judge:

I.      Introduction

        On May 31, 2016, plaintiffs Mark Horowitz ("Horowitz") and Montauk U.S.A., LLC

("Montauk") (collectively, "plaintiffs") commenced this action against defendant 148 South

Emerson Associates, LLC ("defendant" or "Associates"), asserting claims for trademark

infringement, and false designation of origin and unfair competition, in violation of Sections 32

and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), respectively; trademark dilution in

violation of the Federal Trademark Dilution Act ("FTDA") under Section 43(c) of the Lanham

Act, 15 U.S.C. § 1125(c); and cybersquatting in violation of the Anticybersquatting Consumer

Protection Act ("ACPA") under Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).  Pending

before the Court are: (1) plaintiffs' motion for a preliminary injunction enjoining Associates from

(a) using certain trademarks ("the Sloppy Tuna Marks") registered to Montauk "in any manner,

including, but not limited to, using or employing the Sloppy Tuna Marks in connection with any

goods, services, signage, décor, menus, employee clothing, marketing, advertising, merchandise,

domain name, and/or social media[,]" (Order to Show Case at 1-2), and (b) "from making or

employing any derivation or colorable imitation of the Sloppy Tuna Marks, or any mark confusingly similar thereto or likely to dilute the Sloppy Tuna Marks[,]" (*id.* at 2); and (2) defendant's motion (a) to dismiss the complaint pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure on the basis that venue is improper under the "first-filed" rule or, in the alternative, to stay this action pending disposition of a prior action commenced by Montauk against, *inter alia,* Associates in the United States District Court for the Northern District of Georgia, Atlanta Division ("the Northern District of Georgia"), *Montauk U.S.A., LLC v. 148 South Emerson Assocs., LLC, et al.*, No. 1:14-cv-4075-LMM, on or about December 23, 2014 ("the Georgia Federal Action"), (b) to dismiss plaintiffs' third cause of action for cybersquatting pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief, and (c) for costs and attorney's fees pursuant to Rule 41(d) of the Federal Rules of Civil Procedure.  For the reasons set forth below, defendant's motion is granted to the extent set forth herein and plaintiffs' motion is denied.


II.     Background

A.      Factual Allegations[1]

Montauk is a Georgia limited liability company formed in August 2010.  (Complaint ["Compl."], ¶¶ 3, 8).  At all relevant times, Drew Doscher ("Doscher") was the sole member and owner of Montauk.  (*Id.*, ¶ 3).  Horowitz is Montauk's manager.  (*Id.*)  According to plaintiffs,

---

[1]  The factual allegations in the complaint are assumed to be true for purposes of this motion, "unless contradicted by more specific allegations or documentary evidence," *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011), and do not constitute findings of fact by the Court.

after Montauk was formed, Horowitz "began purchasing and registering a variety of domain names in mutual consent with Doscher and Montauk[,]" including www.thesloppytuna.com; www.mysloppytuna.com; www.thesloppytunastore.com; www.sloppytunasmtkusa.com; www.sloppytunasmontaukusa.com; and www.thesloppytunamtk.com (collectively, "the Domain Names").  (*Id.*, ¶ 36).

In August 2010, Doscher was partners with Michael Meyer ("Meyer"), Michael Meagher ("Meagher") and Stephen Smith ("Smith") in The Seaport Group, LLC ("Seaport"), "an organization which handles sales and transfers on the global credit market."  (Compl., ¶ 9).

In or around March 2011, (1) Doscher, Meyer, Meagher and Smith (a) formed two (2) New York limited liability companies: (i) 148 South Emerson Partners, LLC ("Emerson Partners"), for the purpose of purchasing real property located at 148 South Emerson Avenue, Montauk, New York, on which to operate a seasonal restaurant and bar, (Compl., ¶ 10); and (ii) Associates, for the purpose of opening and operating the restaurant and bar, (*id.*), and (b) agreed that a third limited liability company would be formed to hold the intellectual property related to the Sloppy Tuna and license it to Associates, (*id.*, ¶ 19); and (2) Doscher's attorney began to register certain trademarks related to the Sloppy Tuna in Montauk's name with the United States Patent and Trademark Office ("USPTO") in two (2) classes: (a) wearable garments and (b) restaurant and bar services.  (*Id.*, ¶ 17).  At all relevant times, each member owned a twenty-five percent (25%) interest in Emerson Partners.  (*Id.*, ¶ 11).  Although each member also owned a twenty-five percent (25%) interest in Associates at its inception, Doscher and Meyer have each owned a fifty percent (50%) interest in Associates since late 2012.  (*See* Compl., ¶¶ 4, 14-15).

On April 14, 2011, Associates filed a Certificate of Assumed Name in the New York

State Department of State pursuant to Section 130 of the New York General Business Law, indicating that it would be doing business as "The Sloppy Tuna." (Declaration of Michael Burrows ["Burrows Decl."], Ex. 18). Doscher executed the certificate as a member of Associates. (*Id.*) The Sloppy Tuna restaurant and bar opened for business in May 2011. (Compl., ¶ 12).

In January 2013, Doscher was terminated from Seaport. (Compl., ¶ 16). In or about June 2013, Doscher commenced an arbitration proceeding against Seaport, Meyer, Meagher and Smith, before the Financial Industry Regulatory Authority ("FINRA"), alleging breach of contract; retaliatory discharge; unjust enrichment; and securities fraud under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5, and seeking more than fifteen million dollars ($15,000,000.00) in damages. (*See* Compl., Ex. F). On October 22, 2013, the arbitral panel awarded Doscher almost two million three hundred thousand dollars ($2.3 million).[2]

On or about October 18, 2013, Montauk ostensibly entered into a license agreement with Associates ("the License Agreement") pursuant to which, *inter alia*, Montauk granted Associates "a non-exclusive, personal and non-transferable license" to use certain service marks and logos

---

[2] Doscher's subsequent petition to vacate and modify in part the arbitration award was dismissed by the United States District Court for the Southern District of New York for lack of subject matter jurisdiction. *Doscher v. Sea Port Group Sec., LLC*, No. 15-cv-384, 2015 WL 4643159 (S.D.N.Y. Aug. 5, 2015). However, on appeal, the United States Court of Appeals for the Second Circuit vacated the district court's order and judgment and remanded the case for further proceedings. *Doscher v. Sea Port Group Sec., LLC*, — F.3d —, 2016 WL 4245427 (2d Cir. Aug. 11, 2016).

provided therein ("the Sloppy Tuna Marks")[3] "in connection with Services for the operation of The Sloppy Tuna restaurant and bar business located in Montauk, New York and subject to the terms and conditions set forth [there]in . . . ." (Compl., Ex. D, ¶ 2). The License Agreement was executed by Horowitz, as Montauk's manager, on behalf of Montauk, and Doscher, as Associate's "manager," on behalf of Associates, and is not notarized.[4] (*Id.*, Ex. D at 6). Meyer did not execute the License Agreement. (*See id.*).

On February 10, 2014, Meyer, Meagher and Smith commenced an action against Doscher and Associates in the Supreme Court of the State of New York, County of Suffolk ("the New York state court"), *Meagher v. Doscher*, No. 060807/2014 (N.Y. Sup. Ct.), seeking judgment declaring that they each still owned twenty-five percent (25%) of Emerson Partners ("the Partners' Action"). (Compl., ¶ 27 and Ex. F).

During the summer of 2014, Doscher "continued to manage the business of Associates . .

---

[3] The Sloppy Tuna Marks consist of, *inter alia*, the following: (1) "the words 'The Sloppy Tuna Montauk, U.S.A.' to the left of a grinning tuna fish wearing sunglasses and a hat, carrying a striped surfboard under his left fin/arm," which was registered with the USPTO in the classes of (a) wearable garments and clothing, namely shirts, and (b) restaurant and bar services on February 21, 2012; (2) "a grinning tuna fish wearing sunglasses and a hat, carrying a striped surfboard under his left fin/arm," which was registered with the USPTO in the classes of (a) wearable garments and clothing, namely shirts, and (b) restaurant and bar services on May 1, 2012; (3) the phrase "Sloppy Poppy," which was registered with the USPTO in the class of alcoholic beverages, namely, a Bloody Mary, on July 31, 2012; (4) the phrase "Get Your Sloppy On," which was registered with the USPTO in the classes of (a) wearable garments and clothing, namely shirts, and (b) restaurant and bar services on August 21, 2012; (5) the term "Slopology," which was registered with the USPTO in the class of alcoholic beverages except beers on August 21, 2012; and (6) the phrase "The Sloppy Tuna," which was registered with the USPTO in the classes of (a) clothing, namely, shirts, shorts, sweatshirts, undergarments and hats, and (b) restaurant and bar services on October 9, 2012. (Compl., Ex. D at 7 and Ex. E).

[4] In other words, by executing the License Agreement on behalf of Associates, Doscher has bound Associates to pay his solely-owned Georgia company significant royalty payments for the use of the disputed trademarks.

. .'' (Compl., ¶ 28).  According to Montauk, "Meyer was never seen at the premises the entire 2014 season." (*Id.*)

On October 9, 2014, Meyer commenced an action against Associates and Doscher in the New York state court, *Meyer v. 148 South Emerson Associates, LLC*, No. 068379/2014 (N.Y. Sup. Ct.), seeking, *inter alia*, an accounting and the appointment of a temporary receiver pursuant to Section 6401(a) of the New York Civil Practice Law and Rules to take "all action necessary to protect and preserve the accounts of [Associates] on the ground that [he] has an apparent interest in that property, and there is a danger that the property will be materially injured" ("the Accounting Action").  (*See* Compl., Ex. F).

On November 20, 2014, Associates commenced a proceeding against Montauk before the Trademark Trial and Appeal Board ("TTAB") in the USPTO to cancel two (2) of the Sloppy Tuna Marks registered to Montauk pursuant to 15 U.S.C. § 1604 and 37 C.F.R. §§ 2.111(b) and 2.112(b) on the basis that they were procured by fraud ("the TTAB Cancellation Proceeding"). (Burrows Decl., Ex. 5; *see* Compl., Ex. F).

On December 23, 2014, Montauk filed the Georgia Federal Action against Associates, Meyer, Meagher and Smith, seeking, *inter alia*, judgment declaring "(1) that it did not procure any fraud upon the USPTO when registering the [Sloppy Tuna Marks]; (2) of non-infringement of certain trademarks the Defendants [therein] claim an interest; . . . (3) that any alleged trademark rights asserted by [the] Defendants [therein] are invalid and unenforceable," (Burrows Decl., Ex. 6 at 1-2; *see* Compl., Ex. F), (4) "that it is the lawful owner of the [Sloppy Tuna] Trademarks, . . . that . . . Associates [sic] rights in the [Sloppy Tuna] Trademarks derive solely from the license agreement between [Montauk] and Associates, . . . that [Montauk] is not

infringing, has not infringed, and is not liable for infringing any trademark rights allegedly owned by Associates[,] . . . [and] that . . . Meyer has no legal or equitable interest in the [Sloppy Tuna] Trademarks." (Burrows Decl., Ex. 6 at 14-15).  On January 2, 2015, Montauk filed a motion with the USPTO to suspend the TTAB Cancellation Proceeding in light of the Georgia Federal Action, which was granted.  (*See* Compl., Ex. F).

On January 29, 2015, Meyer, individually and derivatively on behalf of Associates, commenced an action against Montauk and Doscher in the New York state court, *Meyer v. Montauk U.S.A., LLC*, No. 600830/2015 (N.Y. Sup. Ct.), seeking, *inter alia*, judgment declaring that the License Agreement is invalid and void *ab initio* ("the Trademark License Action"). (Burrows Decl., Ex. 3; *see* Compl., Ex. F).

On February 18, 2015, Montauk and Doscher removed the Trademark License Action to this Court on the basis that this Court (a) has original jurisdiction under 28 U.S.C. § 1331 because "it is an action for declaratory judgment arising under [i] the Trademark Laws of the United States, 15 U.S.C. § 1051, *et seq.* . . .; (ii) 15 U.S.C. § 1125, *et seq.* . . . ; and (iii) 28 U.S.C. §§ 2201 and 2202 . . . ," (Docket Entry ["DE"] 1 in 15-cv-853, ¶ 4); and (b) has jurisdiction based upon the diversity of citizenship of the parties pursuant to 28 U.S.C. § 1332. (*Id.*, ¶ 5).  By order dated March 24, 2016, the Honorable Joseph F. Bianco, United States District Judge, *inter alia*, remanded the Trademark License Action to the New York state court. *Meyer v. Montauk U.S.A., LLC*, No. 15-cv-853 (E.D.N.Y. Mar. 24, 2016).

By Short Form Order dated February 19, 2015, the New York state court (Garguilo, J.), *inter alia*, (1) granted judgment in the Partners' Action declaring that Meyer and Smith "each continue to own a 25% interest in [Emerson Partners]," (Burrows Decl., Ex. 1 at 4); (2)

appointed a temporary receiver in the Accounting Action for the purposes of (a) "answering the Complaint in the [Georgia Federal Action], investigating the merits of each of the claims in the [Georgia Federal] [A]ction and proceeding to defend the action on the merits if the defenses are meritorious and not-frivolous [sic][,]" (*id.* at 6), and (b) "enter[ing] upon the premises with full authority to examine and inspect all financial records of [Associates] and report to [it] as to the source of funds utilized by . . . Doscher, in connection with litigation involving [Associates], Montauk . . . and [Emerson Partners]," (*id.* at 7); and (3) "reserve[d] its decision concerning an expansion of the duty and responsibilities of the Receiver pending the report noted [therein]." (*Id.*; *see also* Compl., Ex. F).  An order appointing Charles C. Russo, Esq. ("the Receiver") as a temporary receiver for the purposes set forth in the Short Form Order was entered in the New York state court on March 13, 2015.  (Burrows Decl., Ex. 2).  Doscher appealed the New York state court's February 19, 2015 Short Form Order to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department ("the Second Department"), (Compl., Ex. F), but there is no indication that the appeal has been decided.

During the summer of 2015, Doscher "remained in control of the operations of Associates[,]" notwithstanding the Receiver's appointment.  (Compl., ¶ 29).

On June 3, 2015, Emerson Partners commenced an action against Associates in the New York state court, assigned index number 605850/2015, seeking to evict Associates as a tenant ("the Eviction Proceeding").  (*See* Compl., Ex. F).  By order dated September 16, 2015, the New York state court, *inter alia*, denied the approximately fifteen (15) motions and petitions filed by the parties in the various actions before it without prejudice pending the outcome of the Eviction Proceeding.  (Compl., Ex. F, Attachment ["Attach."] 2).

By order dated January 19, 2016, the Northern District of Georgia, upon the Receiver's application, stayed the Georgia Federal Action pending the New York state court's determination of the validity of the License Agreement in the Trademark License Action.  (Burrows Decl., Ex. 22).

On February 23, 2016, Doscher, individually and derivatively on behalf of both Associates and Emerson Partners, commenced an action in the New York state court against Meyer, Meagher, Smith, Greenberg Traurig, LLP and Michael Burrows, Esq. ("Burrows"), *Doscher v. Meyer*, No. 602879/2016 (N.Y. Sup. Ct.), seeking, *inter alia*, (1) judgment declaring that a statement made by Burrows on February 22, 2016 that Doscher was "cooking the books" of Associates was false, unsubstantiated, made in bad faith and frivolous; violated Section 487 of the New York Judiciary Law and Rules 3.3(a)(1), 8.4-c and 8.4(d) of the New York Rules of Professional Conduct,  N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.0; constitutes a fraud on the court and intentional misrepresentation; and is trade disparagement and defamation *per se*, (2) an order holding the defendants therein in contempt and sanctioning them, (3) damages, and (4) injunctive relief enjoining the defendants therein "from stating that the books of Associates were or are being 'cooked,' in any way[,] shape or form and/or in any forum and/or venue" ("the Slander Action")[5].  (Burrows Decl., Ex. 4).

On March 16, 2016, upon the Receiver's application in the Accounting Action, the New York state court issued an order to show cause and a temporary restraining order (1) granting the

---

[5]  By order dated July 19, 2016, the New York state court, *inter alia*, dismissed the Slander Action and sanctioned both Doscher and his attorney pursuant to Section 8303-a of the New York Civil Practice Law and Rules for bringing a frivolous action.  (Reply Declaration of Receiver Charles C. Russo in Support of Defendant's Motion to Dismiss the Complaint ["Russo Reply"], Ex. 2).

Receiver "authority to take immediate control over the management of and authority over the daily operations and financial management of [Associates] until further Order of th[at] Court[,]" (Compl., Ex. G); (2) directing Doscher to "immediately surrender control over and access to the daily operations and financial management of [Associates] to the Court-appointed Temporary Receiver, . . ." (*id.*); and (3) restraining Doscher "from participating in daily operations and financial management of, entering into contracts on behalf of, or entering the premises of the business operated by [Associates], and . . . *from interfering in any way with the Court-appointed Temporary Receiver in his operation and management of the company[,]*" pending further order of that court.  (*Id.*; *see also* Compl., ¶ 31) (emphasis added).

By letter to the Receiver dated March 24, 2016, A. Todd Merolla, Esq., counsel for Montauk, purportedly gave Associates "formal notice of termination of the . . . License Agreement . . . ."  (Compl., Ex. H).  The letter indicated that the termination was effective immediately, *i.e.*, as of March 24, 2016, as "a result of [Mr. Russo's] appointment as a receiver for Associates, and is expressly permitted by Section 3 of the License Agreement under th[o]se circumstances."  (*Id.*)  The letter demanded, *inter alia*, that Associates (1) "perform its post-termination obligations, including but not limited to the de-identification procedures as specified in Section 17 of the License Agreement[;]" (2) cease using the Sloppy Tuna Marks; (3) "remove and change any signs, logos, and décor so as to distinguish the premises from its former appearance related to the marks[;]" (4) turn over all "items containing use of the Marks [that are] in an off-site storage facility" in East Hampton, New York and "all existing inventory containing any of the Marks;" and (5)  "immediately pay [Montauk] the full amount of all recurring fees and other charges due under the License Agreement through the date it completes the de-

identification process[,]" which was estimated to be approximately seven hundred twenty-seven thousand six hundred twenty-three dollars and ninety-six cents ($727,623.96).  (*Id.*)  In addition, the letter provided:

> "Last, regarding the website owned by Mark Horowitz, **www.thesloppytuna.com,** in light of your appointment and usurpation of control of Associates, be advised that Associates may no longer use that domain name. Same for the Facebook page, Twitter account, and Instagram account – Associates is no longer permitted to use any of these social media accounts for THE SLOPPY TUNA."

(*Id.*)

On that same date, Montauk commenced an action against Associates in the Superior Court of Fulton County, State of Georgia ("the Georgia state court") seeking, *inter alia*, damages for Associates's purported breach of the License Agreement or, in the alternative, under the theories of quantum meruit and unjust enrichment; and injunctive relief compelling Associates's compliance with its post-termination obligations under the License Agreement ("the Georgia State Action").  (Burrows Decl., Ex. 7).

By letter dated March 25, 2016, the Receiver responded to Montauk's termination letter, in relevant part, as follows:

> "Unless I am specifically directed to do so by [the New York state court], I will not turn over any items, nor will I comply with any of the demands and requests in your letter without the express authority of th[at] Court.  It is the position of Associates that that [sic] the License Agreement is invalid, *void* [sic] *ab initio*, and of no force or effect.  Additionally, the question of the validity of the License Agreement is the subject of a declaratory judgment action now pending before Judge Garguilo [the New York state court].  Therefore, I will take no action related to the License Agreement without the express authority of Judge Garguilo.
>
> . . .
>
> I would also ask that you forward to me, or have Mr. Horowitz forward me, his

11

> attorney's information so that I can address those issues related to Mr. Horowitz accordingly."

(Compl., Ex. I).

By order dated March 29, 2016, the New York state court, *inter alia*, found that Doscher,

> "through counsel continues to exhibit a need to exercise in the perversion of good faith litigation.  The latest 2000 page plus motion has taken the Courts [sic] patience to the outer ridge of our solar system.  It is a duplicative and redundant regurgitation of it's [sic] countless predecessors, representing an effort to paralyze the orderly litigation process to which all parties are entitled."

(Compl., Ex. F, Attach. 3 at 3).  Accordingly, the state court, *inter alia*, denied Doscher's

pending motion "as nothing more than a grossly overweight petition to reargue and not in

compliance with the Part Rules and Procedures of th[at] Court . . . ," (*id.* at 4), and directed "that

a copy of th[at] Order shall be annexed as an exhibit to any subsequent motion in any court

exercising jurisdiction of this dispute."  (*Id.*)

In a decision and order dated April 14, 2016, the New York state court, after a hearing in

the Eviction Proceeding, found that there was no leasehold between Emerson Partners and

Associates, but stayed "the ejectment of Associates pending the determination of the Appeal of

th[at] Court's Order declaring that all equity in 'Partners,' the landowner, vests equally in

Messers Meyer, Meagher, Smith & Doscher on the condition that the Receiver, within thirty (30)

days of [the date thereof] negotiates a month to month occupancy between the two LLCs ending

the Tuesday after Labor Day 2016."  (Compl., Ex. F, Attach. 9 at 7).  In a supplemental order

dated April 15, 2016, the state court, *inter alia* extended the date on which the month-to-month

occupancy is to end through October 31, 2016.  (*Id.*, Attach. 10).

On or about April 21, 2016, Doscher commenced an Article 78 proceeding in the New

York state court, *Matter of Drew Doscher v. Hon. Jerry Garguilo*, No. 605850/2015 (N.Y. Sup.

Ct.), seeking a writ of mandamus compelling Justice Garguilo to render a determination on

certain motions pending before him.  (*See* Compl., Ex. F).

By order dated April 22, 2016, the New York state court, *inter alia*, found, in relevant

part:

> "It should be noted that the responsibilities of the Receiver in this matter did not
> occur overnight.  Noteworthy is the fact, . . . Meyer, a fifty percent (50%) equity
> holder in Associates d/b/a 'The Sloppy Tuna' offers no objection to the
> appointment of the Receiver.  Those responsibilities were augmented, much as an
> evolution, occasioned by the acts of omission and acts of commission.  At the
> genesis of this case, it was determined that . . . Doscher, the admitted owner on
> premises, had avoided filing tax returns for years and was hoarding, without
> distribution, several million dollars.  Also, there arose a question concerning the
> everyday operations of the business known as The Sloppy Tuna. [] In order to
> minimize the impact of a Receiver's intervention, the Court brokered an
> arrangement between Mr. Doscher and Mr. Meyer, owners of The Sloppy Tuna.
> Mr. Meyer would hire a manager (Jessica Brantly) to be employed by The Sloppy
> Tuna with access to all financial matters as well as day to day operations.  What
> occurred hereafter is worthy of remark.  Mr. Doscher was heard, on audio tape,
> harassing, intimidating and otherwise frightening Mr. Meyer's manager, Ms.
> Brantly.  His words wreaked of misogynistic, sexist remarks.  His hostility was
> compellingly offensive.  That audio tape . . . was played in open court and Mr.
> Doscher acknowledged an understanding of the Court's displeasure."

(Compl., Ex. F, Attach. 8 at 3-4) (footnote omitted).  In denying Doscher's application seeking

its recusal, the state court held, *inter alia*,

> "The Court considers the actions of [Doscher] and his attorney as a continuing
> effort to paralyze the Court with a deluge of repetitive papers.  That deluge may
> represent a self inflicted wound. [Doscher] complains of exorbitant receiver
> related expenses."

(*Id.* at 9).  In granting the Receiver's petition to expand his powers and "allow[] him to take

immediate control over the management of and authority over the daily operations, and financial

management of [Associates]," the state court found, *inter alia*:

"The Receiver points out disturbing irregularities concerning financial transactions discovered during his appointment. . . .

The Receiver notes his deep concern over the 'legal fees' and other disbursements made from Associate's [sic] funds totaling over Six Hundred Eight Thousand Dollars ($680,000.00) [sic] for which he has yet to receive adequate explanations and/or supporting documentation as to why this money was spent, what it was spent for, and why it was paid from Associate's [sic] funds. . . .

Of concern to the Court, is the confirmed fact that many of the transactions of a questionable nature previously input into the company's QuickBooks from prior years have been changed, modified or adjusted.  These 'back date adjustments' present serious concerns to the Court as well as to the Receiver.

. . .

The Receiver notes that adjustments have been posted to remove what appears to be the companies [sic] patents/trademarks and related expenses, record and adjustments due to/from [Emerson Partners], and adjust 'buyout arrangements' and 'return on capital' that may be related to former members of the company.

In addition, the Receiver has become aware of many violations of law pending against Associates, and incurred during [Doscher's] tenure.  As noted by the Receiver during a recent appearance, there are approximately fifteen (15) State Liquor Authority violations outstanding, town ordinance violations, noise violations, requiring a local court to issue a warrant for the arrest of a key person employed by . . . Doscher.

. . .

No one may debate that it was within the Court's inherent power and discretion to have appointed the Receiver to operate The Sloppy Tuna in the very first instance. The Court did not do so.  Instead, what has expanded the Receiver's power on 'as needed basis' was dictated in large measure by the conduct of . . . Doscher. Despite this Court's Order not to interfere with duty and operations of the Receiver, Mr. Doscher has chose to do so.  Rather than seek appropriate Judicial Review of the Court's orders, Mr. Doscher caused the publication of Press releases declaring his intentions to close the business, impugning the integrity of the Court and the Receiver. [] The intention to close the business is in direct violation of this Court's Order."

(*Id.* at 10-14) (footnote omitted).

On April 26, 2016, following a hearing, the Georgia state court denied Montauk's

application for a temporary restraining order enjoining Associates from using the Sloppy Tuna

Marks.  (Burrows Decl., Ex. 11).  During the hearing, the following colloquy ensued between the

Georgia state court and A. Todd Merolla, Esq., counsel for Montauk:

> The Court:     But the Judge up there [in New York] ordered that the receiver
>                should be in charge of the restaurant.
>
> Mr. Merolla:   Of Associates.
>
> The Court:     Okay.  What did the judge in New York order?  Maybe I'll ask it
>                that way.
>
> Mr. Merolla:   The judge ordered that Mr. Russo, the receiver, is in charge of
>                running Associates, which is the bar, the operation.  Didn't say
>                anything about the trademarks.
>
> The Court:     What did he say about interfering with the operation of the
>                restaurants [sic]?
>
> Mr. Merolla:   He said he can't interfere with the operations.
>
> The Court:     You go see that judge and find out if he considers or she considers
>                this action to be interfering with the operation of that restaurant.
>                Would you do that for me?
>
> Mr. Merolla:   I'll do whatever you tell me, your honor.
>
> The Court:     Well, I'm not going to – you know, when a judge does something
>                like that, it just seems to me –
>
> Mr. Merolla:   It presumes, your honor –
>
> The Court:     In addition, the point they make about the signage and the expense
>                associated with unwinding all that, you know, I didn't hear your
>                client say we'll pay all that.  We'll pay all that.
>
>                You need to talk to the judge up there, and you also need to
>                consider that issue as well.  Would you do that?

15

> Mr. Merolla:   Your honor, I respectfully disagree.
>
> The Court:   I know you do.  And I really appreciate the way you said 'respectfully.'  It was nice of you to say that.  I can't wait to hear what you tell your client when you walk out the door. But, in any event, I am denying the motion. . . .

(*Id.* at 14-15).

Two (2) days later, *i.e.*, on April 28, 2016, Montauk dismissed the Georgia State Action without prejudice. (Burrows Decl., Ex. 12).

By order dated May 11, 2016, the New York state court, *inter alia*, stayed "any and all proceedings" in five (5) of the six (6) actions before it pending its determination of the issues presented in the Trademark License Action.  (Compl., Ex. F, Attach. 4).  By order dated May 12, 2016, the New York state court directed the clerk of that court to "refuse to accept for filing any paper presented for that purpose, under the [five (5) stayed] actions, unless directed otherwise by th[at] Court."  (Compl., Ex. F, Attach. 5).

By order dated May 20, 2016, the New York state court (1) granted the Receiver "authority to take immediate control over the management of and authority over the daily operations and financial management of [Associates] until further Order of th[e] Court[,]" (Burrows Decl., Ex. 15 at 1); (2) directed Doscher to "immediately surrender control over and access to the daily operations and financial management of [Associates] to the Court-appointed Temporary Receiver, . . ." (*id.* at 2); (3) restrained Doscher "from participating in daily operations and financial management of, entering into contracts on behalf of, or entering the premises of the business operated by [Associates], and . . . from interfering in any way with the Court-appointed Temporary Receiver in his operation and management of the company[;]" and

16

(4) directed Doscher to "cooperate with the Receiver and take all reasonable steps and actions demanded from him by the Receiver in connection with the Receiver's operation of [Associates]" until further order of that court.  (*Id.*)  On that same date, the Receiver filed an ex parte application for approval of a secondary appointment, *i.e.*, to appoint Jeff Capri of Brook Rail Corp. as a secondary appointee to serve as restaurant manager on the basis that "it would be in the Associates' best interests to be run by an experienced restaurant manager who is familiar not only with the restaurant business, but also with the specific nature of managing a restaurant on Eastern Long Island."  (Compl., Ex. Q).

Plaintiffs allege that the Receiver and Associates "engaged in a campaign still to this day to improperly use the [Sloppy Tuna Marks] and trade off the Domain Names[,]"  (Compl., ¶ 38); and that Associates opened for business as The Sloppy Tuna "without authorization" on Memorial Day weekend of 2016.  (Compl., ¶ 40).  According to plaintiffs, certain new "offerings" advertised by "the Russo-Capri managed Associates" that were never provided while Doscher managed it, such as "VIP Bottle service" and a cover charge, "are clearly intended to dilute and destroy the good will Doscher and [Montauk] built up over the last 5 successful summers."  (*Id.*)  "Plaintiffs takes [sic] no position as to how [the Receiver] wants to manages [sic] and operate [Associates] . . . [but claims] he just is not entitled to do it as THE SLOPPY TUNA[;] [n]or use or trade off any of Plaintiffs' other Registered Trademarks or Domain Names."  (*Id.*, ¶ 41).

B.      Procedural History

On May 31, 2016, plaintiffs commenced this action against Associates, asserting claims

for trademark infringement, and for false designation of origin and unfair competition, in

violation of Sections 32 and 43(a) the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), respectively

(first and second claims for relief by Montauk); dilution in violation of the FTDA, 15 U.S.C. §

1125(c) (fourth claim for relief by Montauk); and cybersquatting in violation of the ACPA, 15

U.S.C. § 1125(d) (third claim for relief by plaintiffs).  Plaintiffs seek, *inter alia*, (1) injunctive

relief "enjoining and restraining [Associates] . . . from using, on or in connection with the

manufacture, sale, importation, exportation, purchase, order, offer for sale, distribution,

transmission, advertisement, display and promotion of any products or services, the [Sloppy

Tuna Marks] or other marks that are confusingly similar to the [Sloppy Tuna Marks][,]" (Compl.

at 16); (2) an order directing Associates (a) "immediately to recall any and all infringing goods

and any other packaging, containers, advertising or promotional material or other matter that

displays the [Sloppy Tuna Marks] or other marks that are identical or substantially similar to the

[Sloppy Tuna Marks][,]" (*id.*), (b) "to deliver to Plaintiffs for destruction any and all infringing

goods as well as any other packaging, containers, advertising or promotional material or other

matter bearing the infringing marks pursuant to 15 U.S.C. § 1118[,]" (*id.* at 16-17), (c) "to

account to Plaintiffs for any and all profits derived by [Associates] and all damages sustained by

Plaintiffs by virtue of the actions of [Associates] complained of herein[,]" (*id.* at 17); (d) "to

forfeit or cancel any infringing domain names as a consequence of the actions of [Associates]

complained of herein pursuant to 15 U.S.C. § 1125(d)(1)(C)[,]" (*id.*); and (e) "to pay over to

Plaintiffs any and all profits derived by [Associates] and all damages which Plaintiffs have

18

sustained as a consequence of the actions of [Associates] complained of herein pursuant to 15

U.S.C. § 1117," (*id*.); (3) treble damages pursuant to 15 U.S.C. § 1117; and (4) costs and

attorney's fees.

Plaintiffs now move for a preliminary injunction enjoining Associates from (a) using the

Sloppy Tuna Marks "in any manner, including, but not limited to, using or employing the Sloppy

Tuna Marks in connection with any goods, services, signage, décor, menus, employee clothing,

marketing, advertising, merchandise, domain name, and/or social media[,]" (Order to Show Case

at 1-2), and (b) "from making or employing any derivation or colorable imitation of the Sloppy

Tuna Marks, or any mark confusingly similar thereto or likely to dilute the Sloppy Tuna

Marks[,]" (*id.* at 2).   Associates moves: (a) to dismiss the complaint pursuant to Rule 12(b)(3) of

the Federal Rules of Civil Procedure on the basis that venue is improper under the "first-filed"

rule or, in the alternative, to stay this action pending disposition of the Georgia Federal Action;

(b) to dismiss plaintiffs' third cause of action for cybersquatting pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure for failure to state a claim for relief; and (c) to recover the

reasonable costs and attorney's fees it incurred in defending the Georgia State Action pursuant to

Rule 41(d) of the Federal Rules of Civil Procedure.


III.    Discussion

A.    Meyer's Standing in this Action

Plaintiffs contend, *inter alia*, that Montauk's motion for a preliminary judgment "is

unopposed and should be granted by default[,]" (Plaintiffs' Reply Memorandum of Law in

Further Support of Plaintiffs' Application for a Preliminary Injunction ["Plf. Reply"] at 2), and

that "the Court should disregard Meyer's Motion to Dismiss[]" because, *inter alia*, he has not

moved to intervene in this case pursuant to Rule 24 of the Federal Rules of Civil Procedure and

"is otherwise a stranger to this action, and has no standing to seek or oppose any relief."

(Plaintiffs' Opposition to Michael Meyer's Motion to Dismiss ["Plf. Opp."] at 21).

It is beyond cavil that under New York law[6], members of a limited liability company,

such as Associates, may sue derivatively under certain circumstances when those in control of the

company refuse to act.  *Tzolis v. Wolff*, 10 N.Y.3d 100, 108-09, 855 N.Y.S.2d 6, 884 N.E.2d

1005 (N.Y. 2008).  The rationale behind the derivative suit is that "[w]hen fiduciaries are

faithless to their trust, the victims must not be left wholly without a remedy. . . . [T]o determine

that frauds of this kind are out of the reach of courts of law or equity would lead to an intolerable

grievance[.]" *Id.* at 105 (quotations and citation omitted).

That rationale is equally applicable to circumstances where, as here, one (1) of the two (2)

fifty-percent (50%) owners of a limited liability company ("LLC") causes his wholly-owned

company, and the purported manager of that company, to commence a lawsuit against the LLC

seeking injunctive relief and damages, including treble damages, and the temporary receiver

controlling the LLC fails to appear and defend the action despite a demand to do so.  Under the

circumstances of this case, if this Court does not allow Meyer, the other owner of the LLC, to

appear and defend this action derivatively on behalf of the LLC, *i.e.*, Associates, at least for

purposes of the instant motions, Associates will be in default of this action and plaintiffs' motion

---

[6]  Under Rule 17(b) of the Federal Rules of Civil Procedure, the capacity to sue or be sued
of any party other than an individual who is not acting in a representative capacity and a
corporation, is determined, with exceptions not relevant here, "by the law of the state where the
court is located[.]" Fed. R. Civ. P. 17(b)(3).

for a preliminary judgment would, thus, be unopposed, leading to an "intolerable grievance" against Associates.  "The powers of the court of equity to provide an appropriate remedy for failure of those in control of a corporation [or company] to take appropriate action for the protection of the corporation are not limited to rigid categories."  *Koral v. Savory, Inc.*, 276 N.Y. 215, 219, 11 N.E.2d 883 (N.Y. 1937) (quotations omitted).  A court of equity may exercise its powers in order "to prevent irremediable injury, or a total failure of justice."  *Id.*

Moreover, contrary to plaintiffs' contention, the Receiver did not refuse to defend this action because he "determined, in his best business judgment, that it is better for Associates not to defend the present action[,]" (Plf. Reply at 3), or because he "determined, in his business judgment, that Associates ought not to defend the present action based on cost."  (Plf. Opp. at 22).  Rather, the Receiver failed to act in this case because, *inter alia*, Meyer "commit[ted] to defend Associates – at his own cost" in both this action and the Trademark License Action. (Reply Declaration of Receiver Charles C. Russo in Support of Defendant's Motion to Dismiss the Complaint ["Russo Reply"], ¶ 8; *see also* Sur-Reply Declaration of Receiver Charles C. Russo in Opposition to Plaintiffs' Motion for Preliminary Injunction ["Russo Sur-Reply"], ¶¶ 6 and 30).  The Receiver avers, *inter alia*, that "[b]ased on [Doscher's] past tactics, [he] believe[s], without the slightest doubt, that Doscher will strive to make this case and the Trademark License Action more expensive than all of the related cases combined[,]" (Russo Sur-Reply, ¶ 15), so he has "declined to act for Associates and will leave the defense to Meyer[,] . . . [since he is] presently charged by the [New York state court] with looking after the business of Associates, not with spending the Company's money to finance what Doscher intends to be endless litigation."  (*Id.*, ¶ 16).  Nonetheless, the Receiver further avers that "[i]f Meyer had not so

21

agreed, [he] would have taken all steps necessary to defend Associates in this case[,]" (*id.*); that

he "was prepared to and would have undertaken the defense of this case if Meyer had not done

so[,]" (*id.*, ¶ 11); and that "if Meyer at any time in the future reneges on his commitment, changes

his mind, or otherwise does not defend Associates here . . . , [he] will immediately step in and do

so." (*Id.*, ¶ 12). Since a failure to defend this lawsuit, or oppose plaintiffs' motion for a

preliminary injunction, would constitute an "intolerable grievance" to Associates that was not

intended by the Receiver in the exercise of his business judgment, and it is in the best interests of

Associates to permit Meyer to defend this action derivatively on behalf of Associates at his own

expense, rather than at the expense of Associates, the Court will exercise its powers of equity and

permit Meyer to defend this action derivatively on behalf of Associates, at least for purposes of

the instant motions.

> B.     The "First-Filed" Rule

Generally, "where there are two competing lawsuits, the first suit should have priority,

absent the showing of balance of convenience or special circumstances giving priority to the

second." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 722 (2d Cir.

2010) (quoting *First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989));

*accord Employers Ins. of Wausau v. Fox Entm't Grp., Inc.*, 522 F.3d 271, 274-74 (2d Cir. 2008).

"Deference to the first filing embodies considerations of judicial administration and conservation

of resources, . . . and recognizes that a party who first brings an issue into a court of competent

jurisdiction should be free from the vexation of concurrent litigation over the same subject

matter[.]" *AEP Energy*, 626 F.3d at 722 (quotations and citations omitted); *see also Curtis v.*

*Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000) ("The power to dismiss a duplicative lawsuit is meant to foster judicial economy and the comprehensive disposition of litigation. . . . The doctrine is also meant to protect parties from the vexation of concurrent litigation over the same subject matter." (quotations and citations omitted)).  Accordingly, "when a case is brought in one federal district court and the complaint embraces essentially the same transactions as those in a case pending in another federal district court, the latter court may enjoin the suitor in the more recently commenced case from taking any further action in the prosecution of that case."  *AEP Energy*, 626 F.3d at 722-23 (quotations, alterations and citation omitted).

"Even in the absence of such an injunction, . . . the second court may be bound to stay its consideration of an action in deference to the first-filed proceedings."  *AEP Energy*, 626 F.3d at 723; *see also New Phone Co., Inc. v. City of New York*, 498 F.3d 127, 129 (2d Cir. 2007)  ("As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit.")  "While the decision whether or not to stay or dismiss a proceeding rests within a district judge's discretion, normally sound judicial discretion dictates that the second court decline its consideration of the action before it until the prior action before the first court is terminated, . . . and a district court can go beyond the allowable bounds of discretion when it refuses to stay or dismiss a duplicative suit[.]" *AEP Energy*, 626 F.3d at 723 (quotations, alterations and citations omitted); *see also Adam v. Jacobs*, 950 F.2d 89, 92 (2d Cir. 1991) ("The decision whether or not to stay or dismiss a proceeding rests within a district judge's discretion. . . . [H]owever, a district court can go beyond the allowable bounds of discretion when it refuses to stay or dismiss a duplicative suit." (quotations and citations omitted)).  "In other words, regardless of the action or inaction of the first court, sound judicial discretion ordinarily

23

requires that the second court decline consideration of the action in deference to the proceedings

pending before the first court." *AEP Energy*, 626 F.3d at 724 (quotations, alterations and citation

omitted).

"When considering whether to dismiss the second action, the court considers whether the

lawsuits at issue assert the same rights, and seek relief based upon the same facts." *Castillo v.*

*Taco Bell of Am., LLC*, 960 F. Supp. 2d 401, 404 (E.D.N.Y. 2013). "The lawsuits need not be

identical, but the claims and rights raised in the two actions must not differ substantially."

*Castillo*, 960 F. Supp. 2d at 404; *see also Wyler-Wittenberg v. MetLife Home Loans, Inc.*, 899 F.

Supp. 2d 235, 244 (E.D.N.Y. 2012) ("Proper application of the 'first-filed' rule requires that the

first and subsequently filed cases(s) have either identical or substantially similar parties and

claims.")  "[A]pplication of the rule does not required identical parties in the cases, but merely

requires substantial overlap." *Wyler-Wittenberg*, 899 F. Supp. 2d at 244 (quotations, emphasis

and citation omitted); *see also Catalano v. BMW of N. Am., LLC.*, 167 F. Supp. 3d 540, 551

(S.D.N.Y. 2016) ("Courts have applied the ['first-filed'] doctrine even in the absence of absolute

identity of the parties where there are substantial overlapping factual and legal issues between

both actions."); *Liberty Mut. Ins. Co. v. Fairbanks Co.*, 17 F. Supp. 3d 385, 393 (S.D.N.Y. 2014)

("[T]he existence of non-overlapping claims or parties does not disqualify lawsuits from the first-

filed rule.")

Since, *inter alia*, both this case and the Georgia Federal Action involve substantially

similar issues with regard to the validity, ownership and infringement of the Sloppy Tuna

Marks[7]; there is substantial overlap between the facts, parties and issues in both cases[8]; and plaintiffs do not allege, much less establish, that the balance of convenience or special circumstances justifies giving priority to this action over the previously-filed Georgia Federal Action[9], the "first-filed" rule applies in this case. *See, e.g. Futurewei Techs., Inc. v. Acacia Research Corp.*, 737 F.3d 704, 708 (Fed. Cir. 2013) (holding that "[w]hen two actions that sufficiently overlap are filed in different federal district courts," one for infringement and the other requesting declaratory judgments of non-infringement and invalidity of patents, the action filed later "generally is to be stayed, dismissed, or transferred to the forum of the [prior] action[]" pursuant to the "first-to-file" rule in order "to avoid conflicting decisions and promote judicial efficiency." (quotations and citation omitted)); *Remington Products Corp. v. American Aerovap*, 192 F.2d 872, 873 (2d Cir. 1951) (affirming injunction enjoining the prosecution of a second action for infringement pending final judgment in the first action seeking declaratory judgments of non-infringement and invalidity of patents on the basis, *inter alia*, that "absent the showing of balance of convenience in favor of the second action, [the first suit brought] should have

---

[7] Even plaintiffs' cybersquatting claim involves the issue of the ownership and validity of the Sloppy Tuna Marks. *See* 15 U.S.C. § 1125(d)(1)(A) ("A person shall be liable in a civil action *by the owner of a mark, . . . .*")

[8] Indeed, paragraphs twelve (12) through thirty-two (32) of the complaint filed in the Georgia Federal Action are virtually identical to paragraphs eight (8) through twenty-eight (28) of the complaint filed in this action. In other words, twenty-one (21) of the thirty-four (34) paragraphs setting forth the operative facts of this case are essentially identical to the paragraphs setting forth the operative facts in the Georgia Federal Action.

[9] To the contrary, Montauk affirmatively asserts in the Georgia Federal Action that jurisdiction and venue are proper in the Northern District of Georgia. (Declaration of Michael J. Bowe in Support of Plaintiffs' Opposition to Non-Party Michael Meyer's Motion to Dismiss ["Bowe Decl."], Ex. B at 5; *see also id.*, Ex. E at 2).

priority."); *Spotless Enters. Inc. v. Accessory Corp.*, 415 F. Supp. 2d 203, 206 (E.D.N.Y. 2006) (applying the "first-filed" rule where the first action alleged infringement of a patent and the second action sought declaratory judgments involving the validity and infringement of the patents).  Under the circumstances of this case, particularly the fact that Montauk commenced the Georgia Federal Action seeking, *inter alia*, a declaratory judgment regarding the ownership, validity and non-infringement of the Sloppy Marks only after Associates commenced the TTAB Cancellation Proceeding against it, and then commenced this second action alleging infringement of those same trademarks by Associates approximately seventeen (17) months later, and after unsuccessfully seeking essentially the same injunctive relief in the Georgia State Action, dismissal of this case, rather than a stay of the litigation, is warranted.  *See, e.g. Curtis*, 226 F.3d at 138-39 (A "simple dismissal of the second suit is a[] common disposition because plaintiffs have no right to maintain two actions on the same subject . . . against the same defendant at the same time.")  Accordingly, the branch of defendant's motion seeking dismissal of this action pursuant to the "first-filed" rule is granted and this action is dismissed in its entirety as duplicative of the Georgia Federal Action.[10]

> C.    Fed. R. Civ. P. 41(d)

Rule 41(d) of the Federal Rules of Civil Procedure provides that "[i]f a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court: (1) may order the plaintiff to pay all or part of the costs of

---

[10] In light of this determination, plaintiff's motion for a preliminary injunction is denied without prejudice to renewal in the Georgia Action.

that previous action; and (2) may stay the proceedings until the plaintiff has complied." "Thus,

'where a plaintiff [] voluntarily dismisses a lawsuit and then files a second suit against the same

defendants predicated on the same facts, defendants may be entitled to recover their costs and

attorneys' fees expended in defending the first suit and to stay the second suit until payment of

those costs." *Adams v. New York State Educ. Dep't*, 630 F. Supp. 2d 333, 343 (S.D.N.Y. 2009)

(quotations, alterations and citation omitted); *see also BH Seven, LLC v. Ambit Energy, L.P.*, No.

11-cv-2484, 2012 WL 4445825, at * 2 (E.D.N.Y. Sept. 25, 2012) ("[A]lthough Rule 41(d) does

not explicitly provide for an award of attorney's fees as part of 'costs,' the weight of authority in

this Circuit supports such an award." (quotations and citation omitted)); *Gordon v. Kaleida

Health*, No. 08-cv-950S, 2012 WL 1965671, at * 1 (W.D.N.Y. May 31, 2012) (accord).

 "The purpose of Rule 41(d) is to prevent forum-shopping within the federal court system

[] and serves the broader purpose of penalizing a plaintiff for re-filing the very suit he has

previously dismissed[.]" *Adams*, 630 F. Supp. 2d at 343 (quotations, alterations and citation

omitted); *see also Ramirez v. iBasis, Inc.*, No. 08-cv-5125, 2010 WL 1223589, at * 3 (E.D.N.Y.

Mar. 24, 2010) ("Rule 41(d) is intended to serve as a deterrent to forum-shopping and vexatious

litigation." (quotations and citation omitted)). "Awarding costs and attorneys' fees under Rule

41(d) is completely discretionary." *Adams*, 630 F. Supp. 2d at 344 (quotations and citation

omitted); *see also Zucker v. Katz*, 708 F. Supp. 525, 539 (S.D.N.Y. 1989) ("As clearly evident

from the language of . . . Rule [41(d)], the matter is discretionary with the court." (quotations and

citation omitted)). "Thus, even though a defendant need not show that a plaintiff acted in bad

faith in order to recover, a district court may refuse to impose Rule 41(d) costs on the plaintiff if

it appears that there was a good reason for the dismissal of the prior action or that the plaintiff

financially is unable to pay the costs." *Adams*, 630 F. Supp. 2d at 344 (quotations, alterations and citation omitted); *accord Zucker*, 708 F. Supp. at 539.

Contrary to plaintiffs' contentions, defendant is entitled to an award of costs and attorneys' fees against Montauk pursuant to Rule 41(b) because, *inter alia*, this action is based on, and includes, some of the same claims Montauk raised in the Georgia State Action and Montauk has neither demonstrated that there was a good reason for it to dismiss the Georgia State Action nor that it is financially unable to pay the reasonable costs incurred by Associates in defending the Georgia State Action.  Indeed, twenty-seven (27) of the thirty-three (33) numbered paragraphs in the Georgia state action are virtually identical to paragraphs in the complaint filed in this action.[11]  Moreover, in the Georgia State Action, Montauk sought, *inter alia*, injunctive relief compelling Associates's compliance with its post-termination obligations as specified in Section 17 of the License Agreement, (Burrows Decl., Ex. 7, ¶ 31), which provides, in relevant part:

> "[u]pon termination of this Agreement, [Associates] shall immediately (i) cease to use the [Sloppy Tuna] Marks or hold itself out as a Licensee or user of the Marks and (ii) remove and change any signs, colors or décor so as to distinguish any premises from its former appearance related to the [Sloppy Tuna] Marks."

(*Id.*, Ex. A, ¶ 17).  Thus, in the Georgia State Action Montauk sought to compel Associates, *inter alia*, to cease using the Sloppy Tuna Marks and to remove the Sloppy Tuna Marks from all "signs, colors or décor."  (*Id.*)  This action similarly seeks, *inter alia*, injunctive relief restraining Associates from using the Sloppy Tuna Marks and compelling Associates "to recall any and all

---

[11]  *Compare* paragraphs one (1), two (2) and four (4) through twenty-eight (28) of the complaint in the Georgia state action, (Burrows Decl., Ex. 7), *with* paragraphs three (3), four (4) and eight (8) through thirty-two (32) of the complaint in this action.

infringing goods and any other packaging, containers, advertising or promotional material or other matter that displayed the [Sloppy Tuna] Trademarks . . . ."  (Compl., at 16).  "Costs are most often imposed in circumstances such as those existing here; *i.e.*, where the plaintiff has brought an identical, or nearly identical, claim and requested identical, or nearly identical, relief." *Gordon*, 2012 WL 1965671, at * 1 (quotations and citation omitted).

Furthermore, "[t]he forum-shopping that Rule 41(d) is intended to guard against occurs when a plaintiff voluntarily dismisses the initial suit and refiles [sic] the same action in another court[] . . . because the plaintiff believes he may capture more favorable law in the second venue than the first."  *Ramirez*, 2010 WL 1223589, at * 5 (quotations and citation omitted).  Given the facts, *inter alia*, (1) that Montauk voluntarily dismissed the Georgia State Action only two (2) days after the hearing in which the Georgia state court, *inter alia*, denied its application for a temporary restraining order preventing Associates from using the Sloppy Tuna Marks and directed its counsel to contact the New York state court to ascertain if Judge Garguilo considered the commencement and prosecution of the Georgia State Action to constitute interfering with the operations of the restaurant in violation of his March 16, 2016 order; and (2) commenced this action seeking, *inter alia*, essentially the same injunctive relief sought in the Georgia State Action approximately one (1) month later, it appears that Montauk has engaged in the type of forum-shopping and vexatious litigation against which Rule 41(d) is intended to protect. Accordingly, the branch of defendant's motion seeking costs pursuant to Rule 41(d) of the Federal Rules of Civil Procedure is granted to the extent that Montauk must pay Associates the reasonable costs, including attorney's fees, it incurred in defending the Georgia State Action that Montauk voluntarily dismissed without good reason.  *See, e.g. Gordon*, 2012 WL 1965671, at *

29

2 ("[U]nder Rule 41's plain terms and relevant authority, . . . Rule 41(d)'s purpose is to compensate a defendant for costs and fees that are 'wasted' once a plaintiff voluntarily dismissed an action[.]"); *New Phone Co., Inc. v. New York City Dep't of Info. Tech. & Telecomms.*, Nos. 06-cv-3529 and 07-cv-2474, 2007 WL 2908110, at * 17 (E.D.N.Y. Oct. 5, 2007) (holding that Rule "41(d) permits costs and fees for the 'action previously dismissed,' not the newly commenced action.")  Associates shall serve and file an affidavit delineating the reasonable costs, including attorneys' fees, it incurred in defending the Georgia State Action **on or before November 18, 2016**, or it will be deemed to have waived its right to recover costs pursuant to Rule 41(d).  Montauk must serve any objections to the affidavit **no later than December 2, 2016**.

IV.     Conclusion

For the reasons set forth above, the branches of defendant's motion seeking dismissal of this action pursuant to the "first-filed" rule and costs pursuant to Rule 41(d) of the Federal Rules of Civil Procedure are granted; this action is dismissed in its entirety without prejudice as duplicative of the Georgia Federal Action; Montauk shall pay the reasonable costs, including attorney's fees, Associates incurred in defending the Georgia State Action; and defendant's motion is otherwise denied, and plaintiffs' motion for a preliminary injunction is denied in its entirety, without prejudice to renewal in the Georgia Federal Action.  Associates shall serve and file an affidavit delineating the reasonable costs, including attorneys' fees, it incurred in defending the Georgia State Action **on or before November 18, 2016**, or it will be deemed to have waived its right to recover its costs pursuant to Rule 41(d).  Montauk must serve any

objections to the affidavit **no later than December 2, 2016**.  The Clerk of the Court shall close

this case.

**SO ORDERED.**

_____/s/_____

Sandra J. Feuerstein
United States District Judge

Dated:  October 19, 2016
            Central Islip, New York