UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MARK HOROWITZ and MONTAUK U.S.A., LLC,

                   Plaintiffs,

       -against-

148 SOUTH EMERSON ASSOCIATES, LLC,

                   Defendant.
-------------------------------------------------------------------X
FEUERSTEIN, District Judge:

FILED
CLERK

12:58 pm, May 14, 2018

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

ORDER
16-CV-2741(SJF)(AKT)

I.     Introduction

On May 31, 2016, plaintiffs Mark Horowitz ("Horowitz") and Montauk U.S.A., LLC ("Montauk") (collectively, "plaintiffs") commenced this action against defendant 148 South Emerson Associates, LLC ("defendant" or "Associates"), asserting claims for trademark infringement, and false designation of origin and unfair competition, in violation of Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), respectively; trademark dilution in violation of the Federal Trademark Dilution Act ("FTDA") under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); and cybersquatting in violation of the Anticybersquatting Consumer Protection Act ("ACPA") under Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).  Pending before the Court are: (i) plaintiffs' motion for a preliminary injunction enjoining Associates from (A) using certain trademarks ("the Sloppy Tuna Marks") registered to Montauk "in any manner, including, but not limited to, using or employing the Sloppy Tuna Marks in connection with any goods, services, signage, décor, menus, employee clothing, marketing, advertising, merchandise, domain name, and/or social media[,]" (Order to Show Case at 1-2), and (B) "from making or

1

employing any derivation or colorable imitation of the Sloppy Tuna Marks, or any mark confusingly similar thereto or likely to dilute the Sloppy Tuna Marks[,]" (*id.* at 2); (ii) Associates's motion to dismiss plaintiffs' third cause of action for cybersquatting pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief; and (iii) Associates's affidavit delineating the reasonable costs, including attorney's fees, it incurred in defending the Georgia State Action, set forth below, and Montauk's objections thereto.  For the reasons set forth below, plaintiffs' motion for a preliminary injunction is denied; Associates's motion to dismiss plaintiffs' cybersquatting claim is granted; and Associates is awarded costs pursuant to Rule 41(d) of the Federal Rules of Civil Procedure in the total amount of forty-two thousand seven hundred eleven dollars and forty-eight cents ($42,711.48).

II.     Background

A.     Factual Allegations[1]

Montauk is a Georgia limited liability company formed in August 2010.  (Complaint ["Compl."], ¶¶ 3, 8).  At all relevant times, Drew Doscher ("Doscher") was the sole member and owner of Montauk.  (*Id.*, ¶ 3).  Horowitz is Montauk's manager.  (*Id.*)   At the time Montauk was formed, Doscher was partners with Michael Meyer ("Meyer"), Michael Meagher ("Meagher") and Stephen Smith ("Smith") in The Seaport Group, LLC ("Seaport"), "an organization which handles sales and transfers on the global credit market."  (*Id.*, ¶ 9).

According to plaintiffs, after Montauk was formed, Horowitz "began purchasing and

---

[1]  The factual allegations in the complaint are assumed to be true for purposes of this motion and do not constitute findings of fact by the Court.

registering a variety of domain names in mutual consent with Doscher and Montauk[,]" including

www.thesloppytuna.com; www.mysloppytuna.com; www.thesloppytunastore.com;

www.sloppytunasmtkusa.com; www.sloppytunasmontaukusa.com; and

www.thesloppytunamtk.com (collectively, "the Domain Names").  (Compl., ¶ 36).

In or around March 2011, (1) Doscher, Meyer, Meagher and Smith (a) formed two (2) New York limited liability companies: (i) 148 South Emerson Partners, LLC ("Emerson Partners"), for the purpose of purchasing real property located at 148 South Emerson Avenue, Montauk, New York, on which to operate a seasonal restaurant and bar, (Compl., ¶ 10); and (ii) Associates, for the purpose of opening and operating the restaurant and bar, (*id.*), and (b) agreed that a third limited liability company would be formed to hold the intellectual property related to the Sloppy Tuna and license it to Associates, (*id.*, ¶ 19); and (2) Doscher's attorney began to register certain trademarks related to the Sloppy Tuna in Montauk's name with the United States Patent and Trademark Office ("USPTO") in two (2) classes: (a) wearable garments and (b) restaurant and bar services.  (*Id.*, ¶ 17).  At its inception, each member owned an equal twenty-five percent (25%) interest in Emerson Partners, (*see id.*, ¶ 11), but, as more fully set forth below, there is currently a dispute as to the members' present ownership interest in Emerson Partners. (*See Id.*, ¶ 27).

Although each member also owned a twenty-five percent (25%) interest in Associates at its inception, Doscher and Meyer have each owned a fifty percent (50%) interest in Associates since July 2012.  (*See* Compl., ¶¶ 4, 14-15).  According to plaintiffs, "[f]or Associates[,] Doscher was to be the 'hands on' partner in charge of all operations, including but not limited to employees, business hours, customer inquiries/complaints, and general operational matters."

(*Id.*, ¶ 10).

Although Doscher, Meyer, Meagher and Smith, among others, discussed how to split the equity for the "third limited liability company," (*see* Compl., Ex. B), no agreement was ever reached with respect thereto.  (*Id.*, ¶ 20).

On April 14, 2011, Associates filed a Certificate of Assumed Name in the New York State Department of State pursuant to Section 130 of the New York General Business Law, indicating that it would be doing business as "The Sloppy Tuna."  (Declaration of Michael Burrows in Opposition to Plaintiffs' Motion for Preliminary Injunction ["Burrows Decl."], Ex. 18).  Doscher executed the certificate as a member of Associates.  (*Id.*)

Although no written operating agreement was ever executed with respect to Associates, the restaurant and bar nonetheless opened for business in May 2011.  (Compl., ¶ 12).  According to plaintiffs, "Doscher had previous restaurant experience and handled the operations of the daily affairs[,] [and] [w]hile Meyer owns other restaurants, his involvement in Associates has been limited from the very inception by his own conduct."  (*Id.*, ¶ 13).

On June 1, 2011, Marc Misthal, Esq., an attorney in the law firm of Gottlieb, Rackman & Reisman, P.C., retained by Doscher "to file an application for federal registration of THE SLOPPY TUNA and the LOGO," (Compl., ¶ 18), sent an email to Doscher and Horowitz, which indicates that it was copied to, *inter alia*, Smith, Meyer and Meagher, containing the subject, "RE: Ownership Agreements - The Sloppy Tuna."  (*Id.*, Ex. A).  That email provides, in pertinent part:

> "Attached is a copy of our report on the results of our search for THE SLOPPY TUNA. . . .

> Further to your prior e-mails, we have prepared the Trademark Application for THE SLOPPY TUNA . . . and all that is required now is the signature of someone authorized to sign on behalf of Montauk . . . .
>
> Note that the Trademark Office will likely require further specification of some of these items, but in view of the urgency of the matter, we thought it better to get the application on file ASAP and then fix things later, if the Trademark Office raises an issue.
>
> Also, you should note that because the application is being filed on an intent-to-use basis in the name of Montauk . . . it cannot be assigned or transferred to another entity 1) until proof that the mark is in use has been filed with the Trademark Office or 2) if the other entity buys that portion of Montauk U.S.A.'s business relating to the operation of THE SLOPPY TUNA. . . ."[2]

(*Id.*).  That email does not identify anyone who was "authorized to sign for Montauk," nor who the owners or members of Montauk were.  (*See Id.*)

In January 2013, Doscher was terminated from Seaport.  (Compl., ¶ 16).  In or about June 2013, Doscher commenced an arbitration proceeding against Seaport, Meyer, Meagher and Smith, before the Financial Industry Regulatory Authority ("FINRA"), alleging breach of contract; retaliatory discharge; unjust enrichment; and securities fraud under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5, and seeking more than fifteen million dollars ($15,000,000.00) in damages.  (*See Id.*., Ex. F).  On October 22, 2013, the arbitral panel awarded Doscher almost two million three hundred thousand dollars ($2.3 million).[3]

---

[2]  Although the email indicates that there was an attachment thereto, which is referred to as "Opinion re Search - THE SLOPPY TUNA 06 01 2011.pdf," plaintiffs did not include that attachment in the exhibit attached to the complaint.

[3]  Doscher's subsequent petition to vacate and modify in part the arbitration award was dismissed by the United States District Court for the Southern District of New York ("the Southern District") for lack of subject matter jurisdiction.  *Doscher v. Sea Port Group Sec., LLC*, No. 15-cv-384, 2015 WL 4643159 (S.D.N.Y. Aug. 5, 2015).  However, on appeal, the United

According to plaintiffs, in 2013 "Meyer never showed up at the business[,] . . . [and] did not seek to deliver any input in the day-to-day operations, leaving it to Doscher to manage everything." (Compl., ¶ 23).

On or about October 18, 2013, Montauk ostensibly entered into a license agreement with Associates ("the License Agreement") pursuant to which, *inter alia*, Montauk granted Associates "a non-exclusive, personal and non-transferable license" to use certain service marks and logos provided therein ("the Sloppy Tuna Marks")[4] "in connection with Services for the operation of The Sloppy Tuna restaurant and bar business located in Montauk, New York and subject to the terms and conditions set forth [there]in . . . ." (Compl., Ex. D, ¶ 2). The License Agreement was executed by Horowitz, as Montauk's manager, on behalf of Montauk, and Doscher, as

_____

States Court of Appeals for the Second Circuit ("the Second Circuit") vacated the district court's order and judgment and remanded the case for further proceedings. *Doscher v. Sea Port Group Sec., LLC*, 832 F.3d 372 (2d Cir. 2016). By opinion and order dated December 6, 2017, the Southern District denied Doscher's petition in its entirety and confirmed the arbitration award. *Doscher v. Sea Port Grp. Sec., LLC*, No. 15-cv-384, 2017 WL 6061653 (S.D.N.Y. Dec. 6, 2017). On January 8, 2018, Doscher filed a notice of appeal of the Southern District's December 6, 2017 order, which is *sub judice*. *Doscher v. Sea Port Grp. Sec., LLC*, No. 18-54 (2d Cir. Jan. 8, 2018).

    [4] The Sloppy Tuna Marks consist of, *inter alia*, the following: (1) "the words 'The Sloppy Tuna Montauk, U.S.A.' to the left of a grinning tuna fish wearing sunglasses and a hat, carrying a striped surfboard under his left fin/arm," which was registered with the USPTO in the classes of (a) wearable garments and clothing, namely shirts, and (b) restaurant and bar services on February 21, 2012; (2) "a grinning tuna fish wearing sunglasses and a hat, carrying a striped surfboard under his left fin/arm," which was registered with the USPTO in the classes of (a) wearable garments and clothing, namely shirts, and (b) restaurant and bar services on May 1, 2012; (3) the phrase "Sloppy Poppy," which was registered with the USPTO in the class of alcoholic beverages, namely, a Bloody Mary, on July 31, 2012; (4) the phrase "Get Your Sloppy On," which was registered with the USPTO in the classes of (a) wearable garments and clothing, namely shirts, and (b) restaurant and bar services on August 21, 2012; (5) the term "Slopology," which was registered with the USPTO in the class of alcoholic beverages except beers on August 21, 2012; and (6) the phrase "The Sloppy Tuna," which was registered with the USPTO in the classes of (a) clothing, namely, shirts, shorts, sweatshirts, undergarments and hats, and (b) restaurant and bar services on October 9, 2012. (Compl., Ex. D at 7 and Ex. E).

Associate's "manager," on behalf of Associates, and is not notarized.[5]  (*Id.*, Ex. D at 6).  Meyer did not execute the License Agreement.  (*See Id.*).

On February 10, 2014, Meyer, Meagher and Smith commenced an action against Doscher and Associates in the Supreme Court of the State of New York, County of Suffolk ("the New York state court"), *Meagher v. Doscher*, No. 060807/2014 (N.Y. Sup. Ct.), seeking judgment declaring that they each still owned twenty-five percent (25%) of Emerson Partners ("the Partners' Action").  (Compl., ¶ 27 and Ex. F).  However, according to plaintiffs, Doscher contends: (i) "that in the summer of 2012 . . . Meagher and Smith each agreed to relinquish their interests in [Emerson] Partners, and thereafter received $230,000 in partial payment thereto on December 10, 2012[,]"  (*id.*, ¶ 27); and (ii) that he and Meyer "are the sole owners of [Emerson] Partners on a 50-50 basis[.]" (*Id.*).

During the summer of 2014, Doscher "continued to manage the business of Associates . . . ." (Compl., ¶ 28).  According to plaintiffs, "Meyer was never seen at the premises the entire 2014 season."  (*Id.*)

On October 9, 2014, Meyer commenced an action against Associates and Doscher in the New York state court, *Meyer v. 148 South Emerson Associates, LLC*, No. 068379/2014 (N.Y. Sup. Ct.), seeking, *inter alia*, an accounting and the appointment of a temporary receiver pursuant to Section 6401(a) of the New York Civil Practice Law and Rules to take "all action necessary to protect and preserve the accounts of [Associates] on the ground that [he] has an apparent interest in that property, and there is a danger that the property will be materially

---

[5]  In other words, by executing the License Agreement on behalf of Associates, Doscher attempted to bind Associates to pay his solely-owned Georgia company significant royalty payments for the use of the disputed trademarks.

injured" ("the Accounting Action").  (*See* Compl., Ex. F).

On November 20, 2014, Associates commenced a proceeding against Montauk before the

Trademark Trial and Appeal Board ("TTAB") in the USPTO to cancel two (2) of the Sloppy

Tuna Marks registered to Montauk pursuant to 15 U.S.C. § 1064 and 37 C.F.R. §§ 2.111(b) and

2.112(b) on the basis that they were procured by fraud ("the TTAB Cancellation Proceeding").

(Burrows Decl., Ex. 5; *see* Compl., Ex. F).

On December 23, 2014, Montauk commenced an action against, *inter alia*, Associates

and Meyer in the United States District Court for the Northern District of Georgia, Atlanta

Division ("the Northern District of Georgia"), *Montauk U.S.A., LLC v. 148 South Emerson

Associates, LLC*, No. 17-cv-4747 ("the Federal Trademark Ownership Action")[6], pursuant to the

Trademark Laws of the United States (the "Trademark Act"), 15 U.S.C. § 501, *et seq.*, the

Lanham Act, 15 U.S.C. § 1125, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201

and 2202, seeking, *inter alia*, judgment declaring "(1) that it did not procure any fraud upon the

USPTO when registering the [Sloppy Tuna Marks]; (2) of non-infringement of certain

trademarks the Defendants [therein] claim an interest in; . . . (3) that any alleged trademark rights

asserted by [the] Defendants [therein] are invalid and unenforceable,"  (Burrows Decl., Ex. 6 at

1-2; *see* Compl., Ex. F), (4) "that it is the lawful owner of the [Sloppy Tuna] Trademarks, . . .

that . . . Associates [sic] rights in the [Sloppy Tuna] Trademarks derive solely from the license

agreement between [Montauk] and Associates, . . . that [Montauk] is not infringing, has not

---

[6] Although Meagher and Smith were also initially named as defendants in the Federal
Trademark Ownership Action, Montauk voluntarily dismissed its claims against them in that
action without prejudice pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure
on March 9, 2015, (*see* Docket Entry ["DE"] 20 in 17-cv-4747), which was approved by the
Northern District of Georgia on March 10, 2015.

infringed, and is not liable for infringing any trademark rights allegedly owned by Associates[,] . . . [and] that . . . Meyer has no legal or equitable interest in the [Sloppy Tuna] Trademarks." (Burrows Decl., Ex. 6 at 14-15).  On January 2, 2015, Montauk filed a motion with the USPTO to suspend the TTAB Cancellation Proceeding in light of the Federal Trademark Ownership Action, which was granted.  (*See* Compl., Ex. F).

On January 29, 2015, Meyer, individually and derivatively on behalf of Associates, commenced an action against Montauk and Doscher in the New York state court, *Meyer v. Montauk U.S.A., LLC*, No. 600830/2015 (N.Y. Sup. Ct.), seeking, *inter alia*, judgment declaring that the License Agreement is invalid and void *ab initio* ("the Trademark License Action"). (Burrows Decl., Ex. 3; *see* Compl., Ex. F).

On February 18, 2015, Montauk and Doscher removed the Trademark License Action to this Court on the basis that this Court (a) has original jurisdiction under 28 U.S.C. § 1331 because "it is an action for declaratory judgment arising under [i] the Trademark Laws of the United States, 15 U.S.C. § 1051, *et seq.* . . .; (ii) 15 U.S.C. § 1125, *et seq.* . . . ; and (iii) 28 U.S.C. §§ 2201 and 2202 . . . ," (Docket Entry ["DE"] 1 in 15-cv-853, ¶ 4); and (b) has jurisdiction based upon the diversity of citizenship of the parties pursuant to 28 U.S.C. § 1332. (*Id.*, ¶ 5).  By order dated March 24, 2016, the Honorable Joseph F. Bianco, United States District Judge, *inter alia*, remanded the Trademark License Action to the New York state court. *Meyer v. Montauk U.S.A., LLC*, No. 15-cv-853 (E.D.N.Y. Mar. 24, 2016).

By Short Form Order dated February 19, 2015, the New York state court, *inter alia*, (1) granted judgment in the Partners' Action declaring that Meyer and Smith "each continue to own a 25% interest in [Emerson Partners]," (Burrows Decl., Ex. 1 at 4); (2) appointed a temporary

receiver in the Accounting Action for the purposes of (a) "answering the Complaint in the [Federal Trademark Ownership Action], investigating the merits of each of the claims in the [Federal Trademark Ownership Action] and proceeding to defend the action on the merits if the defenses are meritorious and not-frivolous [sic][,]" (*id.* at 6), and (b) "enter[ing] upon the premises with full authority to examine and inspect all financial records of [Associates] and report to [it] as to the source of funds utilized by . . . Doscher, in connection with litigation involving [Associates], Montauk . . . and [Emerson Partners]," (*id.* at 7); and (3) "reserve[d] its decision concerning an expansion of the duty and responsibilities of the Receiver pending the report noted [therein]."   (*Id.*; *see also* Compl., Ex. F).   An order appointing Charles C. Russo, Esq. ("the Receiver") as a temporary receiver for the purposes set forth in the Short Form Order was entered in the New York state court on March 13, 2015.   (Burrows Decl., Ex. 2).   However, by order dated January 24, 2018, upon Doscher's appeal, the Supreme Court of the State of New York, Appellate Division, Second Judicial Department ("the Second Department"), *inter alia*, (i) modified the New York state court's February 19, 2015 Short Form Order and the judgment entered thereupon by deleting the provisions granting Meagher's and Smith's motion for summary judgment in the Partners' Action and declaring that they each hold a twenty-five percent (25%) ownership interest in Emerson Partners, and substituting therefor a provision denying that motion on the grounds that Doscher "raised triable issues of fact as to whether Meagher and Smith orally agreed to transfer their ownership interests in Emerson Partners and whether . . . such an agreement was not invalid under the statute of frauds[,] . . ." *Meagher v. Doscher*, 157 A.D.3d 880, 881-83, 69 N.Y.S.3d 708 (N.Y. App. Div. 2018); and (ii) otherwise affirmed the order and judgment.   *Id.*

During the summer of 2015, Doscher "remained in control of the operations of Associates[,]" notwithstanding the Receiver's appointment. (Compl., ¶ 29). According to plaintiffs, "[e]ven though Russo was appointed receiver of Associates – which was a terminable act under the license agreement – [Montauk] continued to allow Associates use [sic] the [Sloppy Tuna] Marks throughout 2015 because Doscher remained the ultimate responsible person for the operations of Associates." (*Id.*, ¶ 30). Plaintiffs similarly contend that they "permitted Associates to use the Domain Names because Doscher was in charge of the day to day operations[,]" but that consent was terminated, as set forth below, on March 24, 2016. (*Id.*, ¶ 37).

On June 3, 2015, Emerson Partners commenced an action against Associates in the New York state court, assigned index number 605850/2015, seeking to evict Associates as a tenant ("the Eviction Proceeding"). (*See* Compl., Ex. F). By order dated September 16, 2015, the New York state court, *inter alia*, denied the approximately fifteen (15) motions and petitions filed by the parties in the various actions before it without prejudice pending the outcome of the Eviction Proceeding. (Compl., Ex. F, Attachment ["Attach."] 2).

By order dated January 19, 2016, the Northern District of Georgia, upon the Receiver's application, stayed the Federal Trademark Ownership Action pending the New York state court's determination of the validity of the License Agreement in the Trademark License Action. (Burrows Decl., Ex. 22).

On February 23, 2016, Doscher, individually and derivatively on behalf of both Associates and Emerson Partners, commenced an action in the New York state court against Meyer, Meagher, Smith, Greenberg Traurig, LLP and Michael Burrows, Esq. ("Burrows"),

11

*Doscher v. Meyer*, No. 602879/2016 (N.Y. Sup. Ct.), seeking, *inter alia*, (1) judgment declaring

that a statement made by Burrows on February 22, 2016 that Doscher was "cooking the books"

of Associates was false, unsubstantiated, made in bad faith and frivolous; violated Section 487 of

the New York Judiciary Law and Rules 3.3(a)(1), 8.4-c and 8.4(d) of the New York Rules of

Professional Conduct,  N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.0; constitutes a fraud on the

court and intentional misrepresentation; and is trade disparagement and defamation *per se*, (2) an

order holding the defendants therein in contempt and sanctioning them, (3) damages, and (4)

injunctive relief enjoining the defendants therein "from stating that the books of Associates were

or are being 'cooked,' in any way[,] shape or form and/or in any forum and/or venue" ("the

Slander Action")[7].  (Burrows Decl., Ex. 4).

On March 16, 2016, upon the Receiver's application in the Accounting Action, the New

York state court issued an order to show cause and a temporary restraining order (1) granting the

Receiver "authority to take immediate control over the management of and authority over the

daily operations and financial management of [Associates] until further Order of th[at] Court[,]"

(Compl., Ex. G); (2) directing Doscher to "immediately surrender control over and access to the

daily operations and financial management of [Associates] to the Court-appointed Temporary

Receiver, . . ." (*id.*); and (3) restraining Doscher "from participating in daily operations and

financial management of, entering into contracts on behalf of, or entering the premises of the

business operated by [Associates], and . . . *from interfering in any way with the Court-appointed*

---

[7]  By order dated July 19, 2016, the New York state court, *inter alia*, dismissed the
Slander Action and sanctioned both Doscher and his attorney pursuant to Section 8303-a of the
New York Civil Practice Law and Rules for bringing a frivolous action.  (Reply Declaration of
Receiver Charles C. Russo in Support of Defendant's Motion to Dismiss the Complaint ["Russo
Reply"], Ex. 2).

*Temporary Receiver in his operation and management of the company*[,]" pending further order

of that court. (*Id.*; *see also* Compl., ¶ 31) (emphasis added).

By letter to the Receiver dated March 24, 2016, A. Todd Merolla, Esq., counsel for

Montauk, purportedly gave Associates "formal notice of termination of the . . . License

Agreement . . . ." (Compl., Ex. H). The letter indicated that the termination was effective

immediately, i.e., as of March 24, 2016, as "a result of [Mr. Russo's] appointment as a receiver

for Associates, and is expressly permitted by Section 3 of the License Agreement under th[o]se

circumstances." (*Id.*) The letter demanded, *inter alia*, that Associates (1) "perform its post-

termination obligations, including but not limited to the de-identification procedures as specified

in Section 17 of the License Agreement[;]" (2) cease using the Sloppy Tuna Marks; (3) "remove

and change any signs, logos, and décor so as to distinguish the premises from its former

appearance related to the marks[;]" (4) turn over all "items containing use of the Marks [that are]

in an off-site storage facility" in East Hampton, New York and "all existing inventory containing

any of the Marks;" and (5) "immediately pay [Montauk] the full amount of all recurring fees and

other charges due under the License Agreement through the date it completes the de-

identification process[,]" which was estimated to be approximately seven hundred twenty-seven

thousand six hundred twenty-three dollars and ninety-six cents ($727,623.96). (*Id.*) In addition,

the letter provided:

> "Last, regarding the website owned by Mark Horowitz, www.thesloppytuna.com,
> in light of your appointment and usurpation of control of Associates, be advised
> that Associates may no longer use that domain name. Same for the Facebook
> page, Twitter account, and Instagram account – Associates is no longer permitted
> to use any of these social media accounts for THE SLOPPY TUNA."

(*Id.*)

On that same date, Montauk commenced an action against Associates in the Superior Court of Fulton County, State of Georgia ("the Georgia state court") seeking, *inter alia*, damages for Associates's purported breach of the License Agreement or, in the alternative, under the theories of *quantum meruit* and unjust enrichment; and injunctive relief compelling Associates's compliance with its post-termination obligations under the License Agreement ("the Georgia State Action"). (Burrows Decl., Ex. 7).

By letter dated March 25, 2016, the Receiver responded to Montauk's termination letter, in relevant part, as follows:

> "Unless I am specifically directed to do so by [the New York state court], I will not turn over any items, nor will I comply with any of the demands and requests in your letter without the express authority of th[at] Court. It is the position of Associates that that [sic] the License Agreement is invalid, void *ab initio*, and of no force or effect. Additionally, the question of the validity of the License Agreement is the subject of a declaratory judgment action now pending before Judge Garguilo [the New York state court]. Therefore, I will take no action related to the License Agreement without the express authority of Judge Garguilo.
>
> . . .
>
> I would also ask that you forward to me, or have Mr. Horowitz forward me, his attorney's information so that I can address those issues related to Mr. Horowitz accordingly."

(Compl., Ex. I).

By order dated March 29, 2016, the New York state court, *inter alia*, found that Doscher,

> "through counsel continues to exhibit a need to exercise in the perversion of good faith litigation. The latest 2000 page plus motion has taken the Courts [sic] patience to the outer ridge of our solar system. It is a duplicative and redundant regurgitation of it's [sic] countless predecessors, representing an effort to paralyze the orderly litigation process to which all parties are entitled."

(Compl., Ex. F, Attach. 3 at 3). Accordingly, the state court, *inter alia*, denied Doscher's

pending motion "as nothing more than a grossly overweight petition to reargue and not in compliance with the Part Rules and Procedures of th[at] Court . . . ," (*id.* at 4), and directed "that a copy of th[at] Order shall be annexed as an exhibit to any subsequent motion in any court exercising jurisdiction of this dispute." (*Id.*)

In a decision and order dated April 14, 2016, the New York state court, after a hearing in the Eviction Proceeding, found that there was no leasehold between Emerson Partners and Associates. (Compl., Ex. F, Attach. 9 at 7). Upon Doscher's appeal, the Second Department affirmed the New York state court's April 14, 2016 order. *148 South Emerson Partners, LLC v. 148 South Emerson Associates, LLC*, 157 A.D.3d 887, 70 N.Y.S.3d 213 (N.Y. App. Div. 2018).

On or about April 21, 2016, Doscher commenced an Article 78 proceeding in the New York state court, *Matter of Drew Doscher v. Hon. Jerry Garguilo*, No. 605850/2015 (N.Y. Sup. Ct.), seeking a writ of mandamus compelling Justice Garguilo to render a determination on certain motions pending before him. (*See* Compl., Ex. F).

By order dated April 22, 2016, the New York state court, *inter alia*, found, in relevant part:

> "It should be noted that the responsibilities of the Receiver in this matter did not occur overnight. Noteworthy is the fact, . . . Meyer, a fifty percent (50%) equity holder in Associates d/b/a 'The Sloppy Tuna' offers no objection to the appointment of the Receiver. Those responsibilities were augmented, much as an evolution, occasioned by the acts of omission and acts of commission. At the genesis of this case, it was determined that . . . Doscher, the admitted owner on premises, had avoided filing tax returns for years and was hoarding, without distribution, several million dollars. Also, there arose a question concerning the everyday operations of the business known as The Sloppy Tuna. [] In order to minimize the impact of a Receiver's intervention, the Court brokered an arrangement between Mr. Doscher and Mr. Meyer, owners of The Sloppy Tuna. Mr. Meyer would hire a manager (Jessica Brantly) to be employed by The Sloppy Tuna with access to all financial matters as well as day to day operations. What

15

occurred hereafter is worthy of remark.  Mr. Doscher was heard, on audio tape,
harassing, intimidating and otherwise frightening Mr. Meyer's manager, Ms.
Brantly.  His words wreaked of misogynistic, sexist remarks.  His hostility was
compellingly offensive.  That audio tape . . . was played in open court and Mr.
Doscher acknowledged an understanding of the Court's displeasure."

(Compl., Ex. F, Attach. 8 at 3-4) (footnote omitted).  In denying Doscher's application seeking

its recusal, the state court held, *inter alia*,

"The Court considers the actions of [Doscher] and his attorney as a continuing
effort to paralyze the Court with a deluge of repetitive papers.  That deluge may
represent a self inflicted wound. [Doscher] complains of exorbitant receiver
related expenses."

(*Id.* at 9).  In granting the Receiver's petition to expand his powers and "allow[] him to take

immediate control over the management of and authority over the daily operations, and financial

management of [Associates]," the New York state court found, *inter alia*:

"The Receiver points out disturbing irregularities concerning financial
transactions discovered during his appointment. . . .

The Receiver notes his deep concern over the 'legal fees' and other disbursements
made from Associate's [sic] funds totaling over Six Hundred Eight Thousand
Dollars ($680,000.00) [sic] for which he has yet to receive adequate explanations
and/or supporting documentation as to why this money was spent, what it was
spent for, and why it was paid from Associate's [sic] funds. . . .

Of concern to the Court, is the confirmed fact that many of the transactions of a
questionable nature previously input into the company's QuickBooks from prior
years have been changed, modified or adjusted.  These 'back date adjustments'
present serious concerns to the Court as well as to the Receiver.

. . .

The Receiver notes that adjustments have been posted to remove what appears to
be the companies [sic] patents/trademarks and related expenses, record and
adjustments due to/from [Emerson Partners], and adjust 'buyout arrangements'
and 'return on capital' that may be related to former members of the company.

In addition, the Receiver has become aware of many violations of law pending

16

against Associates, and incurred during [Doscher's] tenure.  As noted by the
Receiver during a recent appearance, there are approximately fifteen (15) State
Liquor Authority violations outstanding, town ordinance violations, noise
violations, requiring a local court to issue a warrant for the arrest of a key person
employed by . . . Doscher.

. . .

No one may debate that it was within the Court's inherent power and discretion to
have appointed the Receiver to operate The Sloppy Tuna in the very first instance.
The Court did not do so.  Instead, what has expanded the Receiver's power on 'as
needed basis' was dictated in large measure by the conduct of . . . Doscher.
Despite this Court's Order not to interfere with duty and operations of the
Receiver, Mr. Doscher has chose to do so.  Rather than seek appropriate Judicial
Review of the Court's orders, Mr. Doscher caused the publication of Press
releases declaring his intentions to close the business, impugning the integrity of
the Court and the Receiver. [] The intention to close the business is in direct
violation of this Court's Order."

(*Id.* at 10-14) (footnote omitted).

On April 26, 2016, following a hearing, the Georgia state court denied Montauk's

application for a temporary restraining order enjoining Associates from using the Sloppy Tuna

Marks.  (Burrows Decl., Ex. 11).  During the hearing, the following colloquy ensued between the

Georgia state court and A. Todd Merolla, Esq., counsel for Montauk:

| | |
|---|---|
| The Court: | But the Judge up there [in New York] ordered that the receiver should be in charge of the restaurant. |
| Mr. Merolla: | Of Associates. |
| The Court: | Okay.  What did the judge in New York order?  Maybe I'll ask it that way. |
| Mr. Merolla: | The judge ordered that Mr. Russo, the receiver, is in charge of running Associates, which is the bar, the operation.  Didn't say anything about the trademarks. |
| The Court: | What did he say about interfering with the operation of the restaurants [sic]? |

17

| Mr. Merolla: | He said he can't interfere with the operations. |
| The Court: | You go see that judge and find out if he considers or she considers this action to be interfering with the operation of that restaurant. Would you do that for me? |
| Mr. Merolla: | I'll do whatever you tell me, your honor. |
| The Court: | Well, I'm not going to – you know, when a judge does something like that, it just seems to me – |
| Mr. Merolla: | It presumes, your honor – |
| The Court: | In addition, the point they make about the signage and the expense associated with unwinding all that, you know, I didn't hear your client say we'll pay all that. We'll pay all that. |
| | You need to talk to the judge up there, and you also need to consider that issue as well. Would you do that? |
| Mr. Merolla: | Your honor, I respectfully disagree. |
| The Court: | I know you do. And I really appreciate the way you said 'respectfully.' It was nice of you to say that. I can't wait to hear what you tell your client when you walk out the door. But, in any event, I am denying the motion. . . . |

(*Id.* at 14-15).

Two (2) days later, i.e., on April 28, 2016, Montauk dismissed the Georgia State Action without prejudice. (Burrows Decl., Ex. 12).

By order dated May 11, 2016, the New York state court, *inter alia*, stayed "any and all proceedings" in five (5) of the six (6) actions before it pending its determination of the issues presented in the Trademark License Action. (Compl., Ex. F, Attach. 4). By order dated May 12, 2016, the New York state court directed the clerk of that court to "refuse to accept for filing any paper presented for that purpose, under the [five (5) stayed] actions, unless directed otherwise by

th[at] Court." (Compl., Ex. F, Attach. 5).

By order dated May 20, 2016, the New York state court (1) granted the Receiver "authority to take immediate control over the management of and authority over the daily operations and financial management of [Associates] until further Order of th[e] Court[,]" (Burrows Decl., Ex. 15 at 1); (2) directed Doscher to "immediately surrender control over and access to the daily operations and financial management of [Associates] to the Court-appointed Temporary Receiver, . . ." (*id.* at 2); (3) restrained Doscher "from participating in daily operations and financial management of, entering into contracts on behalf of, or entering the premises of the business operated by [Associates], and . . . from interfering in any way with the Court-appointed Temporary Receiver in his operation and management of the company[;]" and (4) directed Doscher to "cooperate with the Receiver and take all reasonable steps and actions demanded from him by the Receiver in connection with the Receiver's operation of [Associates]" until further order of that court. (*Id.*)  On that same date, the Receiver filed an *ex parte* application for approval of a secondary appointment, i.e., to appoint Jeff Capri of Brook Rail Corp. as a secondary appointee to serve as restaurant manager on the basis that "it would be in the Associates' best interests to be run by an experienced restaurant manager who is familiar not only with the restaurant business, but also with the specific nature of managing a restaurant on Eastern Long Island." (Compl., Ex. Q).

Plaintiffs allege that the Receiver and Associates "engaged in a campaign still to this day to improperly use the [Sloppy Tuna Marks] and trade off the Domain Names[,]" (Compl., ¶ 38); and that Associates opened for business as The Sloppy Tuna "without authorization" on Memorial Day weekend of 2016. (Compl., ¶ 40).  According to plaintiffs, certain new

"offerings" advertised by "the Russo-Capri managed Associates" that were never provided while Doscher managed it, such as "VIP Bottle service" and a cover charge, "are clearly intended to dilute and destroy the good will Doscher and [Montauk] built up over the last 5 successful summers." (*Id.*)  "Plaintiffs takes [sic] no position as to how [the Receiver] wants to manages [sic] and operate [Associates] . . . [but claims] he just is not entitled to do it as THE SLOPPY TUNA[;] [n]or use or trade off any of Plaintiffs' other Registered Trademarks or Domain Names." (*Id.*, ¶ 41).


      B.    Procedural History

On May 31, 2016, plaintiffs commenced this action against Associates, asserting claims for trademark infringement, and for false designation of origin and unfair competition, in violation of Sections 32 and 43(a) the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), respectively (first and second claims for relief by Montauk); dilution in violation of the FTDA, 15 U.S.C. § 1125(c) (fourth claim for relief by Montauk); and cybersquatting in violation of the ACPA, 15 U.S.C. § 1125(d) (third claim for relief by plaintiffs).  Plaintiffs seek, *inter alia*, (1) injunctive relief "enjoining and restraining [Associates] . . . from using, on or in connection with the manufacture, sale, importation, exportation, purchase, order, offer for sale, distribution, transmission, advertisement, display and promotion of any products or services, the [Sloppy Tuna Marks] or other marks that are confusingly similar to the [Sloppy Tuna Marks][,]" (Compl. at 16); (2) an order directing Associates (a) "immediately to recall any and all infringing goods and any other packaging, containers, advertising or promotional material or other matter that displays the [Sloppy Tuna Marks] or other marks that are identical or substantially similar to the

[Sloppy Tuna Marks][,]" (*id.*), (b) "to deliver to Plaintiffs for destruction any and all infringing goods as well as any other packaging, containers, advertising or promotional material or other matter bearing the infringing marks pursuant to 15 U.S.C. § 1118[,]" (*id.* at 16-17), (c) "to account to Plaintiffs for any and all profits derived by [Associates] and all damages sustained by Plaintiffs by virtue of the actions of [Associates] complained of herein[,]" (*id.* at 17); (d) "to forfeit or cancel any infringing domain names as a consequence of the actions of [Associates] complained of herein pursuant to 15 U.S.C. § 1125(d)(1)(C)[,]" (*id.*); and (e) "to pay over to Plaintiffs any and all profits derived by [Associates] and all damages which Plaintiffs have sustained as a consequence of the actions of [Associates] complained of herein pursuant to 15 U.S.C. § 1117," (id.); (3) treble damages pursuant to 15 U.S.C. § 1117; and (4) costs and attorney's fees.

By order dated October 19, 2016, this Court, *inter alia*, (i) allowed Meyer to defend this action derivatively on behalf of Associates; (ii) upon Meyer's motion, filed on behalf of Associates, (A) dismissed this action without prejudice pursuant to the "first-filed" rule, as duplicative of the Federal Trademark Ownership Action that was then-pending in the Northern District of Georgia, and (B) and directed Montauk to pay Associates the reasonable costs, including attorney's fees, it incurred in defending the Georgia State Action, in an amount to be determined, pursuant to Rule 41(d) of the Federal Rules of Civil Procedure; (iii) denied so much of Meyer's motion, filed on behalf of Associates, as sought dismissal of plaintiffs' third cause of action for cybersquatting pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief, and plaintiffs' motion for a preliminary injunction in its entirety, without prejudice to renewal in the Northern District of Georgia, where the Federal Trademark

21

Ownership Action was then-pending; and (iv) directed Associates to serve and file an affidavit delineating the reasonable costs, including attorneys' fees, it incurred in defending the Georgia State Action by November 18, 2016, and Montauk to serve any objections thereto by no later than December 2, 2016.

Associates filed an affidavit in accordance with this Court's October 19, 2016 order on November 17, 2016.  The following day, (i) the parties filed a stipulation extending plaintiffs' time to file any objections to Associates's affidavit until December 9, 2016; and (ii) Montauk filed a notice of appeal to the Second Circuit of this Court's October 19, 2016 order and the judgment entered thereupon.  Although plaintiffs filed their objections to Associates's affidavit on December 9, 2016, this Court deferred determining the amount of costs to be awarded to Associates pursuant to Rule 41(d) of the Federal Rules of Civil Procedure during the pendency of Montauk's appeal of the October 19, 2016 order.

By order dated May 9, 2017, the New York state court, *inter alia*, granted Meyer's petition in the Trademark License Action to the extent of declaring that the License Agreement between Associates and Montauk, containing the forum selection clause upon which the jurisdiction and venue of the Northern District of Georgia in the Federal Trademark Ownership Action was based, "is deemed void, invalid and of not [sic] force or effect."[8]

---

[8]  As indicated in this Court's April 27, 2018 order in the Federal Trademark Ownership Action, one (1) day after the New York state court held the License Agreement to be void, Meyer, individually and derivatively on behalf of Associates, filed a declaratory judgment action in the New York state court against Montauk and Doscher, *Meyer v. Montauk U.S.A., LLC*, Index No. 608965/2017 (the "State Trademark Ownership Action"), seeking, *inter alia*, judgment pursuant to Section 3001 of the New York Civil Practice Law and Rules (i) declaring that the Sloppy Tuna Marks are the property of Associates and not of Montauk or Doscher; and (ii) "that Associates is the sole and rightful owner of the [Sloppy Tuna] Marks in the State of New York and has the sole right to the use of the [Sloppy Tuna] Marks in the State of New York, including

By order dated June 30, 2017, the Northern District of Georgia, *inter alia*, granted the unopposed motions of Associates and Meyer to lift the stay of the Federal Trademark Ownership Action, and by order dated August 14, 2017 (the "Transfer Order"), the Northern District of Georgia, *inter alia*, granted Montauk's motion to transfer the Federal Trademark Ownership Action to this Court. (DE 103 in 17-cv-4747). That action was transferred to this Court pursuant to the Transfer Order on August 16, 2017. (DE 104 in 17-cv-4747).

By mandate issued on May 11, 2018, pursuant to an opinion and order dated April 20, 2018, the Second Circuit vacated so much of this Court's October 19, 2016 order as dismissed Montauk's complaint under the "first-filed" rule in light of the subsequent transfer of the Federal Trademark Ownership Action from the Northern District of Georgia to this Court, which vitiated the reasoning behind the first-filed ruling; restored plaintiffs' preliminary injunction motion; remanded this matter for further proceedings consistent therewith; and otherwise affirmed the October 19, 2016 order, including, *inter alia*, the award of costs to Associates pursuant to Rule 41(d) of the Federal Rules of Civil Procedure.[9] *Horowitz v. 148 South Emerson Associates LLC*, No. 16-3912 (2d Cir. Apr. 20, 2018). Although the Second Circuit did not specifically restore the branch of Meyer's motion, filed on behalf of Associates, as sought dismissal of plaintiffs' third cause of action for cybersquatting pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, since that branch of Meyer's motion, like plaintiff's preliminary injunction motion,

---

without limitation at the premises located at 148 South Emerson Avenue, Montauk, New York, to the exclusion of either or both of the defendants [Montauk and Doscher]."

[9] In light of the May 11, 2018 mandate remanding this case for further proceeding consistent with the April 20, 2018 opinion and order, the Clerk of the Court shall reopen this case.

was denied without prejudice to renewal in the Northern District of Georgia, the Court considers

that branch of Meyer's motion to be similarly restored in this action.  Accordingly, pending

before this Court are: (i) plaintiffs' restored motion for a preliminary injunction enjoining

Associates from (A) using the Sloppy Tuna Marks "in any manner, including, but not limited to,

using or employing the Sloppy Tuna Marks in connection with any goods, services, signage,

décor, menus, employee clothing, marketing, advertising, merchandise, domain name, and/or

social media[,]" (Order to Show Case at 1-2), and (B) "from making or employing any derivation

or colorable imitation of the Sloppy Tuna Marks, or any mark confusingly similar thereto or

likely to dilute the Sloppy Tuna Marks[,]" (*id.* at 2); (ii) Meyer's restored motion, filed on behalf

of Associates, to dismiss plaintiffs' third cause of action for cybersquatting pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief; and (iii)

Associates's affidavit delineating the reasonable costs, including attorneys' fees, it incurred in

defending the Georgia State Action, and Montauk's objections thereto.


III.    Discussion

    A.    Preliminary Injunction

"A preliminary injunction is an equitable remedy and an act of discretion by the court."

*American Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).  "The purpose of

such interim equitable relief is not to conclusively determine the rights of the parties, . . . but to

balance the equities as the litigation moves forward."  *Trump v. International Refugee Assistance

Project*— U.S. —, 137 S. Ct. 2080, 2087, 198 L. Ed. 2d 643 (2017) (quotations and citations

omitted).  "A preliminary injunction is an extraordinary remedy never awarded as of right."

*Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).  Rather, a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.* at 22, 129 S. Ct. 365.

"A party seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits or [] sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction."  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quotations, alterations and citation omitted); *see also North American Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) ("A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.")  Where, as here, a party seeks a mandatory injunction, which "disrupts the status quo, [the] party . . . must meet a heightened legal standard by showing a clear or substantial likelihood of success on the merits."  *North American Soccer*, 883 F.3d at 37 (quotations and citation omitted).

1.      Likelihood of Success on Merits[10]

_____

[10]  Plaintiffs claim only that Montauk "is entitled to . . . a preliminary injunction for its claims of trademark infringement under 15 U.S.C. §§ 1114 and 1125[,]" (Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction ["Plf. Mem."] at 9; *see also Id.* at 11); they do not assert, much less establish, a likelihood of success on the merits of their trademark dilution or cybersquatting claims.  Moreover, plaintiffs do not contend that there

"A claim of trademark infringement under the Lanham Act is analyzed under a two-prong

test[,]" *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016), pursuant

to which the court first considers "whether the senior user's mark is entitled to protection; . . .

[then] to whether the junior user's use of its mark is likely to cause consumers confusion as to the

origin or sponsorship of the junior user's goods." *Id.*; *see also Christian Louboutin, S.A. v. Yves

Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216-17 (2d Cir. 2012) ("We analyze trademark

infringement claims in two stages.  First, We look to see whether plaintiff's mark merits

protection. . . . Second, if (and only if) the plaintiff's trademark is . . . valid and protectable, we

must then determine whether the defendant's use of a similar mark is likely to cause consumer

confusion."  (quotations, alterations and citations omitted)).  Thus, "[t]he plaintiff in a trademark

infringement action establishes a likelihood of success by showing both 1) a legal, exclusive right

to the mark, and 2) a likelihood that customers will be confused as to the source of the infringing

product." *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999)


a.      Legal, Exclusive Right to the Mark

Plaintiffs correctly contend that, with respect to the first prong, "a certificate of

---

are sufficiently serious questions on the merits to make them a fair ground for litigation.

Furthermore, since the full faith and credit statute, 28 U.S.C. § 1738 "requires federal
courts to give the same preclusive effect to state court judgments that those judgments would be
given in the courts of the State from which the judgments emerged[,]" *Kremer v. Chemical
Constr. Corp.*, 456 U.S. 461, 467, 102 S. Ct. 1883, 72 L. Ed. 2d 262 (1982), and New York
courts would clearly consider the New York state court's determination that the License
Agreement is void and invalid, to be a disposition on the merits having *res judicata* effect, *see
Terry v. Incorporated Village of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016), plaintiffs clearly
cannot succeed on the merits of their trademark infringement claims based upon the void and
invalid License Agreement.

registration with the [US]PTO is prima facie evidence that the mark is registered and valid (i.e., protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Guthrie Healthcare*, 826 F.3d at 37 (quotations and citation omitted); *accord Christian Louboutin*, 696 F.3d at 224-25; *see also* 15 U.S.C. § 1057(b) ("A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate.")  Nonetheless, although Montauk's certificate of registration of the Sloppy Tuna Marks generally gives rise to a statutory presumption that the marks are valid, defendants have rebutted that presumption by showing, *inter alia*, that Montauk, itself, has never used the Sloppy Tuna Marks in commerce, *see generally ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146 (2d Cir. 2007) ("[T]rademark rights are acquired and maintained through use of a particular mark[,] . . . even of marks that have been registered with the [USPTO] . . . . Indeed, one of the fundamental premises underlying the registration provisions in the Lanham Act is that trademark rights flow from priority and that priority is acquired through use"); that Associates has been doing business as "The Sloppy Tuna," has operated the restaurant and bar by that name and has continuously used the Sloppy Tuna Marks in connection therewith since May 2011[11]; and that Associates has sought

_____

[11]    The Second Circuit has held:

"A trade name or mark is merely a symbol of goodwill; it has no independent significance apart from the goodwill it symbolizes.  'A trademark only gives the right to prohibit the use of it so far as to protect the owner's goodwill.'

cancellation of the marks registered to Montauk pursuant to 15 U.S.C. § 1064 and 37 C.F.R. §§ 2.111(b) and 2.112(b).  *See generally Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 267 (2d Cir. 2011) (holding that cancellation of a trademark registration precludes the putative mark owner from utilizing the statutory presumptions and other benefits conferred to him or her through federal registration); *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 535, n. 1 (2d Cir. 2005) ("[T]he owner of an 'incontestable' registered mark may still lose rights in the mark if it is shown, for instance, that the mark was fraudulently registered, or that it was abandoned through three or more continuous years of non-use.")  Accordingly, under the circumstances of this case, plaintiffs have not established a likelihood of success on the merits, much less a clear or substantial likelihood of success on the merits, on their claims that Montauk has a legal, exclusive right to the Sloppy Tuna Marks.

b.    Likelihood-of-Confusion

"The likelihood-of-confusion prong turns on whether ordinary consumers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of the junior user's mark."  *Guthrie Healthcare*, 826 F.3d at 37 (quotations, alterations and citation omitted).  "[S]atisfaction of the likelihood-of-confusion standard requires a probability of confusion, not a mere possibility."  *Id.* (quotations and citation omitted); *see also*

---

> *Prestonettes, Inc. v. Coty* (1924) 264 U.S. 359, 44 S. Ct. 350, 68 L. Ed. 731; . . . . There are no rights in a trademark apart from the business with which the mark has been associated; they are inseparable[.] [citations omitted]."

*Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984); *see also Berni v. International Gourmet Rests. of Am., Inc.*, 838 F.2d 642, 646 (2d Cir. 1988) ("The extent of any trademark rights is defined by its actual use in the marketplace.")

*Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998) ("To support a finding of infringement, a probability of confusion, not a mere possibility, must exist.")

      In considering the likelihood of confusion, courts "generally examine the non-exclusive list of eight factors suggested . . . in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961): the strength of the senior user's mark; the similarity of the parties' marks; the proximity of the parties' areas of commerce; the likelihood that the senior user will bridge the gap separating their areas of activity; the existence of actual consumer confusion; whether the junior user acted in bad faith or was otherwise reprehensible in adopting the mark; the quality of the junior user's product; and the sophistication of the relevant consumer group." *Guthrie Healthcare*, 826 F.3d at 37.   Three (3) additional factors "to be considered when they are pertinent to the facts[,] . . . [are] 'the rather sterile nature of plaintiffs' three-year priority due to their exceedingly limited sales in this country, their long delay in asserting their claim, and the serious harm an injunction would cause the defendant as against the trifling benefit to the plaintiffs.'" *Id.* at 37, n. 3 (quoting *Chandon Champagne Corp. v. San Marino Wine Corp*, 335 F.2d 531, 536 (2d Cir. 1964)).   "The pertinence of individual factors varies with the facts of the particular case[,] [and] [c]ourts should not treat any one factor as dispositive[.]" *Id.* at 37; *see also Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) ("The application of the *Polaroid* test is "not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." (quotations and citation omitted)).

      With respect to the first two (2) factors, there is no dispute that the Sloppy Tuna Marks are distinctive and that the trademarks Associates has been using in connection with its operation

of the subject restaurant and bar since it opened are identical to the trademarks Montauk is

seeking to protect.  However, as indicated above, there are significant issues relating to

Montauk's ownership and use of the Sloppy Tuna Marks which affect the pertinence of those

factors in determining the likelihood of confusion in this case.  Indeed, since only Associates has

ever used the Sloppy Tuna Marks in commerce, public confusion resulting from Associates's

continued use of those marks is unlikely.  In other words, since the originally observed user of

the Sloppy Tuna Trademarks, *i.e.*, Associates, is the same entity currently using those trademarks

in connection with the operation of the same restaurant and bar, there is no likelihood of public

confusion from its continued use of the trademarks.[12]

"The proximity factor can apply to both the subject matter of the commerce in which the

two parties engage and the geographic areas in which they operate[,]" *Guthrie Healthcare*, 826

F.3d at 39, and "[i]ts pertinence depends on the logical proposition that the public is less likely to

draw an inference of relatedness from similar marks when the marks' users are in dissimilar areas

of commerce, or, depending on circumstances, are involved in localized commerce in geographic

areas widely distant from one another."  *Id.*  Since Associates is the only entity that has ever used

the Sloppy Tuna Marks in commerce, *i.e.*, in connection with its operation of the subject

---

[12]  The only difference is in the individual managing the restaurant and bar on behalf of
Associates, *i.e.*, a receiver now controls the management of the restaurant and bar on behalf of
Associates instead of Doscher pursuant to the New York state court's orders in the Accounting
Action.  However, any concerns about the receiver's management of the restaurant and bar are
more appropriately addressed to the New York state court that appointed the receiver than in an
action for trademark infringement against the only entity that has ever used the Sloppy Tuna
Marks in commerce.  Indeed, the error underlying plaintiffs' application for a preliminary
injunction is clear, *inter alia*, from their assertion that "MUSA's [Montauk's] former licensed
Sloppy Tuna restaurant is an identical product to the infringing 'Sloppy Tuna' restaurant . . . ."
(Plf. Mem. at 16).  However, Montauk never owned, "licensed" or operated the subject restaurant
and bar.

restaurant and bar, and Montauk is just a holding company for the intellectual property related to the Sloppy Tuna restaurant and bar, and has never used the trademarks in any area of commerce, whether in connection with the operation of a restaurant and bar or otherwise, consumers are unlikely to be confused by Associates's continued use of the Sloppy Tuna Trademarks in connection with its operation of the subject restaurant and bar.  Similarly, the buyer sophistication factor has little to no bearing on the likelihood of confusion under the circumstances of this case.  *See generally Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996) ("The eighth *Polaroid* factor, 'sophistication of the buyers," has been called 'analogous' to the proximity factor.")

"The factor that focuses on the 'likelihood that the prior owner will bridge the gap,' . . . becomes pertinent primarily when the junior user makes a credible case that there is little or no likelihood of consumer confusion because the senior user operates in a different field of enterprise or a different geographic area." *Guthrie Healthcare*, 826 F.3d at 45 (quoting *Polaroid*, 287 F.2d at 495).  "In such circumstances, the senior user can undercut the force of the junior user's argument by showing a likelihood that it will expand geographically or into other areas of commerce so that the likelihood of confusion will increase."  *Id.*; *see also Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 504 (2d Cir. 1996) ("Bridging the gap refers to the senior user's interest in preserving avenues of expansion and entering into related fields." (quotations and citation omitted)); *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 963 (2d Cir. 1996) (holding that the "bridging the gap" factor "looks to either the likelihood that [the senior user] will enter [the junior user's] business or the average customer's perception of the likelihood that the [senior user] would enter the [junior user's] market.")  However, the evidence in the record

31

indicates that Montauk is merely a holding company for the intellectual property related to the

Sloppy Tuna, and nothing therein, other than Doscher's self-serving statements, suggests that

Montauk ever had any intention of expanding its business into the restaurant field, or that the

public believed it was likely to do so.  *See, e.g. Lebewohl v. Heart Attack Grill LLC*, 890 F.

Supp. 2d 278, 295 (S.D.N.Y. 2012) ("A speculative intention is insufficient to demonstrate that

bridging the gap is likely; a litigant should provide evidence of a concrete expansion plan.")

"[T]he intent of the [senior] user to expand or its activities in preparation to do so, *unless known*

*by prospective purchasers*, does not affect the likelihood of confusion."  *Lang v. Retirement*

*Living Publ'n Co., Inc.*, 949 F.2d 576, 582 (2d Cir. 1991) (emphasis in original) (quotations and

citation omitted).  In short, the record is bereft of any evidence (i) that Montauk has ever used the

Sloppy Tuna Marks in connection with any product or service with which Associates is

competing that might cause public confusion; or (ii) that Montauk ever had any known intention

of expanding its business or commerce into a field related to Associates's field, *i.e.*, the operation

of a bar and restaurant.

Likewise, plaintiffs have not established that "relative quality as between a senior user's

and a junior user's [product or services]," *Guthrie Healthcare*, 829 F.3d at 44, should play any

role in the Court's determination of likelihood of confusion under the circumstances of this case,

particularly since Associates has been the only user of the Sloppy Tuna Marks in commerce.  *See*

*Sports Auth.*, 89 F.3d at 965 (holding that the "relative quality" factor "is primarily concerned

with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior

user's product is of inferior quality." (quotations and citation omitted)).

Moreover, there is no evidence of actual consumer confusion resulting from Associate's

continued use of the trademarks in its operation of the same restaurant and bar; nor of any bad faith on its part in continuing to use the Sloppy Tuna Marks in its operation of the restaurant and bar upon the New York state court's appointment of a receiver.  Indeed, Associates is using the Sloppy Tuna Marks under the direction of the New York state court, and for the purpose of preserving its property, pending resolution of the various lawsuits and disputes between its two (2) owners, Doscher and Meyer.

Furthermore, the injunctive relief sought would provide little benefit to plaintiffs, who have not demonstrated any tangible harm, whether monetary or to their reputation, to the Sloppy Tuna Marks from Associates's continued use thereof, whereas it would cause substantial harm to Associates to enjoin it from continuing to operate the same business it has been operating for the past six (6) years, albeit under the management and control of a receiver instead of Doscher. Accordingly, under the circumstances of this case, plaintiffs have not established a likelihood of success on the merits, much less a clear or substantial likelihood of success on the merits, of their trademark infringement claims against Associates.[13]  Thus, plaintiffs' motion for a preliminary injunction is denied in its entirety.

---

[13]  In light of this determination, it is unnecessary to consider to remaining elements for a preliminary injunction.  *See, e.g. Sadowsky v. City of New York*, 732 F.2d 312, 316 (2d Cir. 1984) (finding that it was "unnecessary to reach the issue of irreparable harm" where the plaintiff had "shown neither a likelihood of success on the merits nor the presence of serious questions going to the merits."); *cf. Winter*, 555 U.S. at 23-24, 129 S. Ct. 365 (declining to address the likelihood of success element for a preliminary injunction where consideration of the public interest element required denial of the requested injunctive relief).

B.      Failure to State a Claim

1.      Standard of Review

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. 544, 127 S. Ct. at 1959.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013) (quotations and citation omitted); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). However, this tenet "is inapplicable to legal conclusions. Threadbare

34

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679, 129 S. Ct. 1937.  "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.*; *see also Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120-1 (2d Cir. 2010); *accord Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 729-30 (2d Cir. 2013).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. 1937.

In deciding a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014).

2.      Plaintiffs' Cybersquatting Claim

Defendant contends, *inter alia*, that plaintiffs fail to state a plausible claim for cybersquatting because it may not reasonably be inferred from the factual allegations in the complaint, and the exhibits attached thereto, that defendant, in registering and using the domain name, <www.Lisloppytuna.com>, had a bad faith intent to profit from the Sloppy Tuna Marks. Plaintiffs contend, *inter alia*, that the following allegations in their complaint state a plausible cybersquatting claim: (i) that on March 24, 2016, Montauk "exercised its right to terminate the License Agreement," (Compl., ¶ 32), which, as indicated above, the New York state court has subsequently found to be void and invalid; (ii) that Associates, and the receiver appointed by the New York state court to manage and control it, "engaged in a campaign still to this day to improperly use the [Sloppy Tuna Marks] and trade off the Domain Names [registered to Horowitz] . . . [and] continues to hold itself out as THE SLOPPY TUNA[,]" by, *inter alia*, registering "the unauthorized domain www.lisloppytuna.com to promote the ongoing business of Associates," (*id.*, ¶ 38); (iii) that "[d]efendant has a bad faith intent to profit from the registration and use of the domain name www.lisloppytuna.com by creating an association with Plaintiff's [sic] famous [Sloppy Tuna Marks] and the Domain Names [registered by Horowitz], including www.thesloppytuna.com as to source and sponsorship[,]" (*id.*, ¶ 53); and (iv) that defendant's domain name "is confusingly similar to, and dilutes the distinctive quality of . . . [Montauk's] famous [Sloppy Tuna Marks] and the Domain Names [registered to Horowitz]," (*id.*, ¶ 54). (*See* Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss ["Plf. Opp."] at 19-20).

The ACPA was enacted "to protect consumers and holders of distinctive trademarks from

36

'cybersquatting,' which 'involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners." *Webadviso v. Bank of Am. Corp.*, 448 F. App'x 95, 97 (2d Cir. Oct. 26, 2011) (summary order) (quoting *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 493 (2d Cir. 2000)).  "To successfully assert a claim under the ACPA, a plaintiff must demonstrate that (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) the infringer has a bad faith intent to profit from that mark." *Webadviso*, 448 F. App'x at 97; *see* 15 U.S.C. § 1125(d)(1)(A) ("A person shall be liable in a civil action by the owner of a mark, . . . if, without regard to the goods or services of the parties, that person– (i) has a bad faith intent to profit from that mark, . . . and (ii) registers, traffics in, or uses a domain name that– (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark . . . .")  For purposes of this motion, only the "bad faith intent to profit" element is at issue.

"A 'bad faith intent to profit' is a term of art in the [ACPA] and cannot be equated with 'bad faith' in other contexts (such as trademark infringement)." *Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, 104 F. Supp. 3d 371, 382 (S.D.N.Y. 2015); *accord NYP Holdings v. New York Post Publ'g, Inc.*, 63 F. Supp. 3d 328, 339 (S.D.N.Y. 2014).  "A plaintiff must show that the defendant's use of the domain name is an attempt to profit specifically from 'squatting' on the domain name with bad faith, rather than simply [] another aspect of the alleged trademark infringement." *Flat Rate Movers*, 104 F. Supp. 3d at 382 (quotations, alterations and citation omitted); *see also Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 437

37

(S.D.N.Y. 2013) ("The requirement of bad faith intent to profit imposes an important limit that cabins the statute's scope and ensures that the ACPA targets only the specific evils that Congress sought to prevent.")

"With respect to the 'bad faith' element, the ACPA lists nine [9] non-exclusive factors for courts to consider in determining whether a domain name registrant has acted in bad faith[,]" *Webadviso*, 448 F. App'x at 97 (citing 15 U.S.C. § 1125(d)(1)(B)(i)); *see also Sporty's Farm*, 202 F.3d at 498, and "also sets forth a 'bad-faith safe harbor' provision[,]" *Webadviso*, 448 F. App'x at 97, n. 2, which provides that "[b]ad faith intent described under subparagraph (A) [of 15 U.S.C. § 1125(d)(1)(a)] shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use *or otherwise lawful*." 15 U.S.C. § 1125(d)(1)(B)(ii) (emphasis added). "[A] court must analyze each case based on its unique circumstances to determine how close a defendant's conduct falls to the ACPA's heartland[,]" *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 325 (S.D.N.Y. 2015), examples of which include situations "where a defendant registers an established entity's domain name in bad faith and offers to sell it to the entity for an exorbitant price[,] . . . [or] where a defendant intends to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those customers would purchase the defendant's products or services." *Id.* (quotations and citations omitted); *see also Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 351 (S.D.N.Y. 2014) (dismissing the plaintiff's cybersquatting claim where the allegations in the complaint did not "suggest that defendants perpetrated the core activities that threaten to result in the paradigmatic harm that the ACPA was enacted to eradicate, that is, the proliferation of cybersquatting– the Internet version of a land grab." (quotations and

citation omitted)); *Gioconda*, 941 F. Supp. 2d at 437 ("The ACPA is designed principally for cases where a defendant either forces a markholder to purchase a domain name at an extortionate price or diverts customers from the markholder's website to the defendant's own website.")

The complaint is bereft of any factual allegations from which it may reasonably be inferred that Associates, or the receiver appointed by the New York state court to manage and control its operations, ever had any intention to profit from any goodwill associated with the Sloppy Tuna Marks by registering and using the domain name at issue. Plaintiffs' conclusory allegations in support of their cybersquatting claim are insufficient to state a plausible claim for relief. *See, e.g. Kaplan*, 16 F. Supp. 3d at 350-51. Moreover, given the New York state court's appointment of the receiver to manage and control the business operations of Associates, which has been doing business as "the Sloppy Tuna" since it opened in 2011 and is the only entity to have ever used the Sloppy Tuna Marks in commerce, the receiver has at least reasonable grounds to believe that the use of the domain name at issue is lawful, thus precluding a finding of bad faith intent to profit under 15 U.S.C. § 1125(d)(1)(B)(ii). Accordingly, the branch of defendant's motion seeking dismissal of plaintiffs' third cause of action for cybersquatting pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and plaintiffs' third cause of action alleging cybersquatting in violation of the ACPA is dismissed in its entirety with prejudice for failure to state a plausible claim for relief.


C.     Amount of Costs Awarded under Fed. R. Civ. P. 41(d)

As indicated above, the Second Circuit affirmed so much of this Court's October 19, 2016 order as found that Associates is entitled to an award of costs, including attorney's fees,

from Montauk pursuant to Rule 41(d) of the Federal Rules of Civil Procedure because, *inter alia*, this action is based on, and includes, some of the same claims Montauk raised in the Georgia State Action and Montauk neither demonstrated that there was a good reason for it to dismiss the Georgia State Action, nor that it is financially unable to pay the reasonable costs incurred by Associates in defending the Georgia State Action.  In the affidavit filed on behalf of Associates in accordance with the October 19, 2016 order, Associates seeks an award in the total amount of forty-seven thousand one hundred ninety-seven dollars and forty-eight cents ($47,197.48) for the reasonable costs, including attorney's fees, it incurred in defending the Georgia State Action.

       1.     Attorney's Fees

Associates seeks to recover attorney's fees in the total amount of forty seven thousand one hundred twenty-two dollars ($47,122.00) based upon, *inter alia*: (a) an hourly rate of four hundred twenty-five dollars ($425.00) for the twelve and forty-three one-hundredths (12.43) hours of work performed by the Receiver, Mr. Russo, a partner in the law firm of Russo, Karl, Widmaier & Cordano, PLLC ("RKWC") who has been practicing law in New York for more than thirty-five (35) years; (b) an hourly rate of two hundred seventy-five dollars ($275.00) for the eight and forty-three one-hundredths (8.43) hours of work performed by John Mulroy, Esq., an associate at RKWC; (c) an hourly rate of four hundred dollars ($400.00) for the sixty-three and four-tenths (63.4) hours of work performed by Shattuck Ely, Esq., a partner in the law firm of Fellows LaBriola LLP ("Fellows LaBriola") who has been practicing law in Georgia for nineteen (19) years; (d) an hourly rate of two hundred ten dollars ($210.00) for the sixty-four and two-tenths (64.2) hours of work performed by Michael C. Gretchen, Esq., an associate at Fellows

LaBriola; and (e) an hourly rate of one hundred seventy dollars ($170.00) for the four (4) hours

of work performed by Natalie S. Spotz, a paralegal at Fellows LaBriola.

In its objections to Associates's affidavit, Montauk asserts, *inter alia*, (i) that Associates's

time entries (A) "include excessive hours for time spent on unsuccessful arguments, time on

work that can be reused in the present action and time for duplicated work[,]" and (B) "do not

adequately explain the work performed, either because they [are] vague or the timekeeper used

block billing," (Montauk's Objections ["Obj."] at 8); (ii) that "all of the fees and costs from work

performed by [Fellows LaBriola] should be excluded, because this work does not constitute

duplicative costs to Associates and is thus not compensable[,]" (*id.* at 15)[14]; (iii) that "[t]he fact

that Associates contest[ed] personal jurisdiction in Georgia also warrants a downward adjustment

in awarded costs[,]" (*id.* at 16); and (iv) that Associates "has not met [its] burden to show that the

hourly rates submitted were appropriate, and accordingly th[o]se rates should be reduced to what

is customary in the Eastern District [of New York]." (*Id.* at 18).  Specifically, Montauk

contends, *inter alia*, (i) that the number of hours expended (A) by Fellows LaBriola should be

reduced by a total of fifty-seven percent (57%), or, in the alternative, should be excluded entirely,

and (B) by RKWC should be reduced by a total of seventy-five percent (75%), (*id.* at 17-18); (ii)

that the hourly rates of both Mr. Mulroy and Mr. Gretchen should be reduced to one hundred

dollars ($100.00) because Associates "submits no evidence about the experience or seniority of

---

[14]  Montauk's reliance on actions taken by Associates in the various other cases between
the parties, and its speculative contention that the motion to stay the Georgia State Action was
"presumably also on the basis of jurisdiction[,]" (Montauk Obj. at 16), are without merit and do
not warrant "a downward adjustment in awarded costs," (*id.*), particularly since this Court
already found that Montauk voluntarily dismissed the Georgia State Action without good reason
in the October 19, 2016 order, and the Second Circuit affirmed so much of that order as awarded
Associates costs under Rule 41(d) of the Federal Rules of Civil Procedure.

either one[,]" (*id.* at 20); (iii) that the hourly rate sought for Ms. Spotz is excessive and should be

reduced to seventy-five dollars ($75.00), (*id.* at 21); (iv) that the hourly rates of both Mr. Russo

and Mr. Ely are excessive and should be reduced to three hundred fifty dollars ($350.00) because

"no complex questions of law were present [in the Georgia State Action] and neither contend

they have specialized expertise[,]" (*id.*); and (v) that the total fees awarded to Associates should

be no more than fourteen thousand one hundred forty-three dollars ($14,143.00).

"In calculating attorney's fees, the district court must first determine the 'lodestar–the

product of a reasonable hourly rate and the reasonable number of hours required by the case–

[which] creates a presumptively reasonable fee.'" *Stanczyk v. City of New York*, 752 F.3d 273,

284 (2d Cir. 2014) (brackets in original) (quoting *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166

(2d Cir. 2011)); *see also Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d

40 (1983) ("The most useful starting point for determining the amount of a reasonable

[attorney's] fee is the number of hours reasonably expended on the litigation multiplied by a

reasonable hourly rate.")  The burden is on the fee applicant to submit evidence to support the

number of hours expended and the rates claimed.  *Hensley*, 461 U.S. at 437, 103 S. Ct. 1933.

a.       Reasonable Hourly Rate

"[A] presumptively reasonable [attorney's] fee boils down to what a reasonable, paying

client would be willing to pay, given that such a party wishes to spend the minimum necessary to

litigate the case effectively." *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 174 (2d

Cir. 2009) (quotations and citation omitted); *accord Bergerson v. New York State Office of*

*Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277, 289-90 (2d Cir. 2011).  Under the

"forum rule" applicable in this Circuit, "courts should generally use the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee." *Restivo v. Hessemann*, 846 F.3d 547, 590 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 644, 199 L. Ed. 2d 528 (2018) (quotations and citation omitted); *see also Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010) ("[T]he lodestar looks to the prevailing market rates in the relevant community." (quotations and citation omitted)).  Thus, in determining a reasonable hourly rate, the court should consider the prevailing rates of lawyers with comparable skill, experience and reputation in the district in which the action was commenced and litigated.  *See Reiter v. MTA New York City Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006); *McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund*, 450 F.3d 91, 96 (2d Cir. 2006).  Rates should be "current rather than historic hourly rates." *Reiter*, 457 F.3d at 232 (quoting *Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998)).

The hourly rates billed by RKWC are commensurate with prevailing hourly rates for attorneys practicing in the Eastern District of New York, *see, e.g. Division 1181 Amalgamated Transit Union– N.Y. Emps. Pension Fund v. D & A Bus Co., Inc.*, 270 F. Supp. 3d 593, 618 (E.D.N.Y. 2017) ("Prevailing rates for experienced attorneys in the Eastern District of New York range from approximately $300 to $400 per hour[,] . . . [although] [s]ome courts have recognized slightly higher ranges in this district of $300–$450 per hour for partners, $200–$300 per hour for senior associates, and $100–$200 per hour for junior associates. (quotations, alterations and citations omitted)); *Houston v. Cotter*, 234 F. Supp. 3d 392, 402 (E.D.N.Y. 2017) ("Courts in the Eastern District of New York award hourly rates ranging from $200 to $450 per hour for partners, $100 to $300 per hour for associates, and $70 to $100 per hour for paralegals"), and the

43

hourly rates billed by the attorneys at Fellows LaBriola are commensurate with prevailing hourly rates for attorneys practicing in the Northern District of Georgia, which encompasses, *inter alia*, Atlanta and Fulton County, Georgia.[15]  *See, e.g. Thomas v. Grease Guard, LLC*, No. 1:14-cv-619-MHC, 2018 WL 1137183, at * 2 (N.D. Ga. Jan. 5, 2018) (finding that the requested rates of four hundred dollars [$400.00] for partners and two hundred seventy-five dollars [$275.00] for associates were consistent with the prevailing market rates in the relevant legal community); *Crossfit, Inc. v. Quinnie*, 232 F. Supp. 3d 1295, 1315 (N.D. Ga. 2017) (finding that the requested rates of three hundred fifty dollars [$350.00] for partners and two hundred ninety-five dollars [$295.00] for associates were consistent with the prevailing rates in that legal community). Accordingly, the hourly rates at which the attorneys at RKWC and Fellows LaBriola billed are reasonable.

However, the hourly rate billed by Ms. Spotz, *i.e.*, one hundred seventy dollars ($170.00), appears to be higher than the prevailing market rates for paralegals in the relevant legal community.  *See, e.g. Thomas*, 2018 WL 1137183, at * 2 (finding that the rate submitted for the paralegals, *i.e.*, one hundred five dollars [$105.00] was consistent with the prevailing market

---

[15]  Although pursuant to the "forum rule," courts in this Circuit "generally use the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee," *Restivo*, 846 F.3d at 590 (quotations and citation omitted), the "presumption in favor of the forum rule," (*id.*), is overcome in this case because, *inter alia*, the Receiver had no choice but to hire counsel outside this district to defend Associates in the Georgia State Action. In other words, since attorney's fees are awarded to Associates for the costs it incurred in defending the Georgia State Action pursuant to Rule 41(d) of the Federal Rules of Civil Procedure, under the circumstances of this case, it is appropriate to use the prevailing hourly rates employed in the district where the costs were incurred, *i.e.*, in the Eastern District of New York for RKWC and the Northern District of Georgia, encompassing Atlanta and Fulton County, Georgia, for Fellows LaBriola.  In any event, the prevailing market rates in both districts are commensurate.

rates in that legal community); *Lewis v. Colvin*, No. 1:15-cv-1483-WSD, 2017 WL 2350211, at *

2 (N.D. Ga. May 31, 2017) (referring to a report that identified paralegal billing rates of one

hundred twenty-eight dollars [$128.00] in Georgia and one hundred eleven dollars [$111.00] in

New York); *Crossfit*, 232 F. Supp. 3d at 1315 (finding that the requested rate of one hundred

fifty dollars [$150.00] fell within the range of the prevailing market rates for paralegals in that

legal community).  Accordingly, the hourly rate for work performed by Ms. Spotz in the Georgia

State Action is reduced to one hundred twenty-five dollars ($125.00) an hour.  Since the four (4)

hours expended by Ms. Spotz appear reasonable, Associates is awarded attorney's fees for the

work performed in the Georgia State Action by Ms. Spotz in the amount of five hundred dollars

($500.00).

   b.   Hours Reasonably Expended

   "[O]nly those hours 'reasonably expended' are to be awarded."  *McDonald*, 450 F.3d at

96 (quoting *Hensley*, 461 U.S. at 434-35, 103 S. Ct. 1933).  In determining the amount of hours

reasonably expended, the court must:

> "examine the hours expended by counsel and the value of the work
> product of the particular expenditures to the client's case.  Efforts
> put into research, briefing and the preparation of a case can expand
> to fill the time available, and some judgment must be made in the
> awarding of fees as to diminishing returns from such further
> efforts. . . .  In making this examination, the district court does not
> play the role of an uninformed arbiter but may look to its own
> familiarity with the case and its experience generally as well as to
> the evidentiary submissions and arguments of the parties."

*Gierlinger*, 160 F.3d at 876 (ellipse in original) (quoting *DiFilippo v. Morizio*, 759 F.2d 231,

235-36 (2d Cir. 1985)); *see also Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997) ("In

reviewing a fee application, the district court examines the particular hours expended by counsel with a view to the value of the work product of the specific expenditures to the client's case.")

"[E]xcessive, redundant, or otherwise unnecessary" hours should be excluded from the attorney's fee calculation. *See Hensley*, 461 U.S. at 434, 103 S. Ct. 1933; *accord Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999); *Gierlinger*, 160 F.3d at 876. In addition, "[c]ourts may reduce the number of hours in a fee application where the time entries submitted by counsel are too vague to sufficiently document the hours claimed." *Barclays Capital Inc. v. Theflyonthewall.com*, No. 06 Civ. 4908, 2010 WL 2640095, at * 4 (S.D.N.Y. June 30, 2010); *see also D&A Bus Co.*, 270 F. Supp. 3d at 619 ("[W]here counsel relies on vague/excessive entries or block billing practices which make it difficult for a court to assess reasonableness, an across-the-board fee reduction is warranted."); *Dagostino v. Computer Credit, Inc.*, 238 F. Supp. 3d 404, 416-17 (E.D.N.Y. 2017) ("[T]he Court has discretion to reduce attorneys' fees where billing records contain vague entries, block entries, claims for excessive amounts of time, and other issues.") "While it is unnecessary for fee applicants to identify with precision the amount of hours allocated to each individual task, . . . attorneys seeking reimbursement must provide enough information for the court, and the adversary, to assess the reasonableness of the hours worked on each discrete project[.]" *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 188 F. Supp. 3d 333, 343 (S.D.N.Y. 2016) (quotations, alterations and citations omitted); *see also Tucker v. City of New York*, 704 F. Supp. 2d 347, 355 (S.D.N.Y. 2010) ("[F]ee applications must be accompanied by contemporaneous time records . . . which must adequately identify the general subject matter of the work that the attorney did during each time slot. . . . This requirement is generally not satisfied by vague entries such as 'conference with' or 'call to'

46

a specified person[,] . . . although the court may be able to deduce the nature and relevance of a generally described time entry based on its familiarity with the case or other contextual clues." (quotations and citation omitted)); *LV v. New York City Dep't of Educ.*, 700 F. Supp. 2d 510, 526 (S.D.N.Y. 2010) (holding that entries that "omit information about the subject matter of the work," *e.g.*, "meeting w/co-counsel" and "conference w/co-counsel," justify a reduction in the hours expended); *Miroglio S.P.A. v. Conway Stores, Inc.*, 629 F. Supp. 2d 307, 313 (S.D.N.Y. 2009) (holding that entries such as "letter to [opposing counsel]," "telephone call to [opposing counsel]" and "discussion with [opposing counsel]" are "overly vague" and "[t]hus courts commonly make percentage reductions for [them].")

"Courts may also make reductions for 'block-billing,' that is, the practice of 'aggregating multiple tasks into one billing entry[,]" *Barclays Capital*, 2010 WL 2640095, at * 4 (quoting *Adorno v. Port Auth. of N.Y. & N.J.*, 685 F. Supp. 2d 507, 515 (S.D.N.Y. 2010), *reconsideration granted on other grounds*, 2010 WL 727480 (S.D.N.Y. Mar. 2, 2010) (citation omitted)); *see also Linde v. Arab Bank, PLC*, 293 F.R.D. 138, 142 (E.D.N.Y. 2013) ("Where billing records include a large number of block-billed entries and there is an issue as to the reasonableness of the number of hours counsel spent on the matter, an across-the-board reduction in billing hours is appropriate"), because "block-billing makes it difficult if not impossible for a court to determine the reasonableness of the time spent on each of the individual services or tasks provided[.]" *Linde*, 293 F.R.D. at 142 (quotations and citation omitted); *see also LV*, 700 F. Supp. 2d at 525 (holding that since "block-billing can make it exceedingly difficult for courts to assess the reasonableness of the hours billed[,] . . . courts have found it appropriate to cut hours across the board by some percentage."); *Miroglio*, 629 F. Supp. 2d at 313-14 ("Block entries . . . have a

tendency to obfuscate the amount of time expended on distinct tasks and introduces an element

of vagueness into a fee application, making it difficult to determine if the reported hours are

duplicative or unnecessary. . . . Reductions are appropriate based on such entries as well."

(quotations, alterations and citations omitted)).   Nonetheless, "[w]hile 'block-billing' is

disfavored and may lack the specificity required for an award of attorneys' fees, it is not

prohibited as long as the court can determine the reasonableness of the work performed."

*Adorno*, 685 F. Supp. 2d at 515; *see also Hines v. City of Albany*, 613 F. App'x 52, 55 (2d Cir.

June 3, 2015) (summary order) (finding that although "block-billing– the grouping of multiple

tasks into a single billing entry– is not per se unreasonable," the district court did not abuse its

discretion in reducing the attorney's fees, in part, on the prevalence of block-billed time entries

where it concluded that the block-billed time entries "frustrated meaningful review of the

reasonableness of the claimed hours.")   "Though courts disfavor block billing in general, it is

most problematic where large amounts of time (e.g., five hours or more) are block billed, thereby

meaningfully clouding a reviewer's ability to determine the projects on which significant legal

hours were spent." *Congregation Rabbinical College*, 188 F. Supp. 3d at 343 (quotations,

alterations and citation omitted).

      Courts may also deduct time spent on duplicative work and effort, *e.g.*, for conferences

between co-counsel, conferences attended by multiple attorneys, repetitive work, etc.  *See, e.g.*

*Congregation Rabbinical College*, 188 F. Supp. 3d at 342; *Allende v. Unitech Design, Inc.*, 783

F. Supp. 2d 509, 515 (S.D.N.Y. 2011), *Grievson v. Rochester Psychiatric Ctr.*, 746 F. Supp. 2d

454, 467-68 (W.D.N.Y. 2010).  In reducing the amount of attorney's fees, the court may exclude

the excessive and unreasonable hours from its calculation by making an across-the-board

reduction, or percentage cut, in the amount of hours.  *See Marion S. Mishkin Law Office v.*

*Lopalo*, 767 F.3d 144, 150 (2d Cir. 2014) ("[D]istrict courts in our Circuit regularly employ

percentage reductions as an efficient means of reducing excessive fee applications."); *McDonald*,

450 F.3d at 96 ("A district court may exercise its discretion and use a percentage deduction as a

practical means of trimming fat from a fee application (quotations and citation omitted)); *Kirsch*

*v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) ("Hours that are 'excessive, redundant, or

otherwise unnecessary,' are to be excluded[;] . . . and in dealing with such surplusage, the court

has discretion simply to deduct a reasonable percentage of the number of hours claimed as a

practical means of trimming fat from a fee application[.]" (quotations and citations omitted)).

   However, although courts have discretion not to award fees for time expended on

unsuccessful claims, motions or arguments, *see, e.g. Quaratino*, 166 F.3d at 427 (affirming the

district court's finding, *inter alia*, that fees should not be awarded for time spent on the plaintiff's

unsuccessful motion for a new trial); *Custodio v. American Chain Link and Construction, Inc.*,

No. 06 Civ 7148, 2014 WL 116147, at * 2 (S.D.N.Y. Jan. 13, 2014) (recommending that hours

spent on an unsuccessful class certification motion be deducted from the attorneys' time), it need

not do so where, as here, the motion or argument, although unsuccessful, was clearly reasonable.

*LV*, 700 F. Supp. 2d at 528 ("A court should not disallow fees for every motion that a prevailing

party did not win, . . . and lawyers may be compensated for advancing plausible though

ultimately unsuccessful arguments." (quotations and citation omitted)); *see, e.g. Dancy v.*

*McGinley*, 141 F. Supp. 3d 231, 242 (S.D.N.Y. 2015); *Marisol A. ex rel. Forbes v. Giuliani*, 111

F. Supp. 2d 381, 393 (S.D.N.Y. 2000).  In light of the fact that the Federal Trademark Ownership

Action was pending in the Northern District of Georgia at the time the Georgia State Action was

commenced, it was clearly reasonable for Associates to seek to remove the Georgia State Action, which was based on the same underlying claims of ownership and use rights to the Sloppy Tuna Marks and sought, *inter alia*, injunctive relief compelling Associates's compliance with its purported post-termination obligations under the License Agreement, including compelling Associates to cease using the same Sloppy Tuna Marks at issue in the Federal Trademark Ownership Action, to the Northern District of Georgia.

Moreover, although "courts in this Circuit consistently have limited payment of Rule 41(d) attorneys' fees to compensation for work done in the first action that cannot be used in a second existing or contemplated action[,]" *Gordon v. Kaleida Health*, No. 08-cv-950S, 2012 WL 1965671, at * 1 (W.D.N.Y. May 31, 2012); *see also Adams v. New York State Educ. Dep't*, 630 F. Supp. 2d 333, 343-44 (S.D.N.Y. 2009) ("Payment of fees upon dismissal without prejudice must be limited to compensation for work that cannot be used in a second contemplated action . . ." (quotations and citation omitted)), it does not appear that any of the work performed by Associates's counsel in the first action can by utilized in this action.  Indeed, even the research performed by Associates's counsel in the Georgia State Action involved either Eleventh Circuit caselaw or Georgia state law, (*see* Burrows Decl., Ex. 3-A), neither of which is applicable in this case.[16]

---

[16]  Moreover, contrary to Montauk's contention, the work performed by Fellows LaBriola in the Georgia State Action is clearly compensable as "duplicative costs to Associates," (Montauk Obj. at 15), since, *inter alia*, Associates was required to defend: (i) an application for a temporary restraining order and preliminary injunction seeking to compel Associates, *inter alia*, to cease using the Sloppy Tuna Marks and to remove the Sloppy Tuna Marks from all signs, colors or décor, under Eleventh Circuit caselaw and/or Georgia state law in the Georgia State Action; and (ii) a similar application for a temporary restraining order and preliminary injunction in this action involving Second Circuit caselaw.  Costs under Rule 41(d) of the Federal Rules of Civil Procedure "are most often imposed in circumstances such as those existing here; *i.e.*, where

However, some of the billing entries on the RKWC invoice are vague and many of the tasks performed by Mr. Russo and Mr. Mulroy appear unnecessarily duplicative.  Indeed, as noted by Montauk, *inter alia*, many of Mr. Russo's and Mr. Mulroy's time records bill "the exact same amount of time on the exact same activities, . . . using identical descriptions[,]" (Montauk Obj. at 12) (emphasis omitted); and there is no apparent need for "two different attorneys in New York to supervise the work of [Fellows, LaBriola]," (*id.*), nor any explanation proffered for why such supervision might be necessary.  Accordingly, the number of hours claimed by both Mr. Russo and Mr. Mulroy are reduced across-the-board by forty percent (40%), *i.e.*, Mr. Russo's hours are reduced to seven and forty-six one-hundredths (7.46) hours and Mr. Mulroy's hours are reduced to five and six one-hundredths (5.06) hours.  Therefore, Associates is awarded attorney's fees for the work performed in the Georgia State Action (i) by Mr. Russo in the amount of three thousand one hundred seventy dollars and fifty cents ($3,170.50); and (ii) by Mr. Mulroy in the amount of one thousand three hundred ninety-one dollars and fifty cents ($1,391.50).

In addition, most of Mr. Ely's billing entries are "block-billed" and/or vague, such that it cannot be determined whether the time he billed for each task was reasonable.  *See, e.g. Chopen v. Olive Vine, Inc.*, No. 12-cv-2269, 2015 WL 1514390, at * 15 (E.D.N.Y. Mar. 13, 2015), *report and recommendation adopted as modified by* 2015 WL 1542082 (E.D.N.Y. Mar. 31, 2015) ("The

---

the plaintiff has brought an identical, or nearly identical, claim and requested identical, or nearly identical, relief."  *Gordon*, 2012 WL 1965671, at * 1 (quotations and citation omitted). It is irrelevant that counsel representing Associates in this action is different than counsel that represented Associates in the Georgia State Action; or that it was the Receiver who retained counsel on behalf of Associates in the Georgia State Action, but Meyer who retained counsel on behalf of Associates in this action.  Associates was a defendant in both of the actions and incurred duplicative litigation costs that are compensable under Rule 41(d) of the Federal Rules of Civil Procedure.

Second Circuit has upheld a district court's reduction in hours in light of 'concerns regarding unspecified conferences, telephone calls, email correspondence, and reviews.'" (quoting *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 64-65 (2d Cir. 2014)); *Larsen v. JBC Legal Grp., P.C.*, 588 F. Supp. 2d 360, 364-65 (E.D.N.Y. 2008) (reducing attorney's fees for vague billing entries merely indicating that counsel engaged in a telephone call or correspondence with another person or the Court, without detailing the subject matter of the call or correspondence). Accordingly, as requested by Montauk with respect to the "block-billed" and vague time entries, the number of hours claimed by Mr. Ely are reduced across-the-board by five percent (5%), *i.e.*, to sixty and twenty-three one-hundredths (60.23) hours.  Therefore, Associates is awarded attorney's fees for the work performed by Mr. Ely in the Georgia State Action in the amount of twenty-four thousand ninety-two dollars ($24,092.00).

Mr. Gretchen's billing entries do not suffer from the same deficiencies as Mr. Ely's or RKWC's entries.  Since the sixty-four and two tenths (64.2) hours expended by Mr. Gretchen in the Georgia State Action appear reasonable, Associates is awarded attorney's fees for the work performed by Mr. Gretchen in the Georgia State Action in the amount of thirteen thousand four hundred eighty-two dollars ($13,482.00).  Accordingly, Associates is awarded the reasonable attorney's fees it incurred in the Georgia State Action pursuant to Rule 41(d) of the Federal Rules of Civil Procedure in the total amount of forty-two thousand six hundred thirty-six dollars ($42,636.00).

2.      Costs

Associates also seeks to recover costs in the total amount of seventy-five dollars and

forty-eight cents ($75.48), *i.e.*, fifteen dollars ($15.00) for a "Flash Delivery charge for documents served via courier" between April 25, 2016 and April 30, 2016; and sixty dollars and forty-eight cents ($60.48) to obtain the transcript from the hearing in the Georgia State Action on April 26, 2016.  (Burrows Decl., Ex. 3-A).  Montauk makes no specific objection to the reimbursement of costs in that amount.  "[S]ince courts, in their discretion, have awarded reasonable costs for various expenses, including computer research, attorney transportation and meals, mailing and copying fees and service and filing fees[,]" *Trustees of New York City Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund and Apprenticeship, Journeyman Retraining, Educ. and Indus. Fund v. Dependable Office Installation LLC*, No. 14-cv-9502, 2017 WL 934713, at *9 (S.D.N.Y. Mar. 9, 2017), *report and recommendation adopted by*, 2017 WL 1157118 (S.D.N.Y. Mar., 27, 2017); *see, e.g. Au New Haven, LLC v. YKK Corp.*, No. 15-cv-3411, 2018 WL 333828, at * 8 (S.D.N.Y. Jan. 5, 2018) (granting the plaintiffs' request for reimbursement for the costs of obtaining a transcript of a court conference); *MGID, Inc. v. Outbrain Inc.*, No. 13-cv-367, 2016 WL 1337303, at * 3 (S.D.N.Y. Mar. 31, 2016) (finding that costs incurred for "reproductions, courier services, research, document binding and processing, filing fees, travel and transportation, working meals, and contracted professional services" are recoverable), Associates is awarded costs in the total amount of seventy-five dollars and forty-eight cents ($75.48) as reimbursement for the expenses it incurred in the Georgia State Action.

For the foregoing reasons, Associates is awarded (i) attorney's fees in the total amount of forty-two thousand six hundred thirty-six dollars ($42,636.00); and (ii) costs in the total amount seventy-five dollars and forty-eight cents ($75.48), for a total award of forty-two thousand seven hundred eleven dollars and forty-eight cents ($42,711.48) as reimbursement for the reasonable

costs it incurred in defending the Georgia State Action pursuant to Rule 41(d) of the Federal Rules of Civil Procedure.

     D.     Consolidation

In light of the Second Circuit's May 11, 2018 mandate, *inter alia*, remanding this action for further proceedings consistent with its April 20, 2018 opinion and order, the Clerk of the Court shall reopen this case for the purpose of entering this order.

However, Rule 42(a) of the Federal Rules of Civil Procedure provides that "[i]f actions before the court involve a common question of law or fact, the court may: . . . consolidate the actions; or issue any other orders to avoid unnecessary cost or delay." District courts have broad discretion to determine whether consolidation is appropriate, *see Hall v. Hall*, — U.S. —, 138 S. Ct. 1118, 1131 (2018); *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284-1285 (2d Cir. 1990), and may consolidate actions under Rule 42(a) *sua sponte*. *See Devlin v. Transportation Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999). Consolidation "should be prudently employed as a valuable and important tool of judicial administration, . . . invoked to expedite trial and eliminate unnecessary repetition and confusion." *Id.* (quotations and citations omitted). Nonetheless, although considerations of judicial economy generally favor consolidation, "[c]onsiderations of convenience and economy must yield to a paramount concern for a fair and impartial trial." *Johnson*, 899 F.2d at 1285; *see also Devlin*, 175 F.3d at 130 ("[E]fficiency cannot be permitted to prevail at the expense of justice– consolidation should be considered when savings of expense and gains of efficiency can be accomplished without sacrifice of justice." (emphasis, quotations and citation omitted)); *accord Chem One, Ltd. v. M/V*

*RICKMERS GENOA*, 660 F.3d 626, 642 (2d Cir. 2011).  In determining whether consolidation is

appropriate, the court must consider:

> Whether the specific risks of prejudice and possible confusion are overborne by
> the risk of inconsistent adjudications of common factual and legal issues, the
> burden on parties, witnesses, and available judicial resources posed by multiple
> lawsuits, the length of time required to conclude multiple suits as against a single
> one, and the relative expense to all concerned of the single-trial, multiple-trial
> alternatives.

*Johnson*, 899 F.2d at 1285 (internal quotations and citations omitted).

Although the Federal Trademark Ownership Action was filed in December 2014, it has

not yet proceeded to discovery and, indeed, was stayed from January 19, 2016 until June 30,

2017.  An initial conference is scheduled to be held before this Court on May 15, 2018 at 11:15

a.m., now that the action has been transferred to this Court and Associates's and Meyer's

motions to dismiss have been denied, at which time, *inter alia*, a discovery schedule will be set.

Moreover, both this case and the Federal Trademark Ownership Action involve substantially

similar issues with regard to the validity, ownership and infringement of the Sloppy Tuna Marks;

there is substantial overlap between the facts, parties and issues in both cases[17]; and there will be

minimal, if any, prejudice or confusion to the parties in consolidating these actions.  Therefore, in

the interests of judicial economy and efficiency, and to minimize the expense and burden on all

parties in prosecuting and defending multiple lawsuits, the two (2) actions are consolidated for

all purposes.  The actions will proceed under the docket number of the first-filed Federal

---

[17]   Indeed, paragraphs twelve (12) through thirty-two (32) of the complaint filed in the
Federal Trademark Ownership Action are virtually identical to paragraphs eight (8) through
twenty-eight (28) of the complaint filed in this action.  In other words, twenty-one (21) of the
thirty-four (34) paragraphs setting forth the operative facts of this case are essentially identical to
the paragraphs setting forth the operative facts in the Federal Trademark Ownership Action.

Trademark Ownership Action, *i.e.*, 17-cv-4747 (the "lead case"), all papers filed in these actions shall henceforth bear <u>only</u> the lead case docket number, the caption of this consolidated action shall be amended in accordance with this Order and this action, under docket number 16-cv-2741, shall be administratively closed.


IV.     Conclusion

For the reasons set forth above, the Clerk of the Court shall reopen this case for the purpose of entering this order; plaintiffs' motion for a preliminary injunction is denied in its entirety; Associates's motion to dismiss plaintiffs' third cause of action for cybersquatting pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and plaintiffs' third cause of action for cybersquatting is dismissed in its entirety with prejudice for failure to state a claim for relief; Montauk shall pay the reasonable costs, including attorney's fees, Associates incurred in defending the Georgia State Action in the total amount of forty-two thousand seven hundred eleven dollars and forty-eight cents ($42,711.48) pursuant to Rule 41(d) of the Federal Rules of Civil Procedure; and this action is *sua sponte* consolidated with the Federal Trademark Ownership Action for all purposes, including trial, to proceed under the lead case docket number, 17-cv-4747.  The Clerk of Court shall amend the caption of the lead case in accordance with this Order and administratively close this action.

SO ORDERED.

                                        _____/s/_____
                                        Sandra J. Feuerstein
                                        United States District Judge


Dated: May 14, 2018
       Central Islip, New York